63 A.3d 1078

**YIM, LLC et al.**

v.

**M. Hasip TUZEER et al.**

**No. 0984, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Feb. 28, 2013.

Reconsideration Denied May 3, 2013.

2

4

**6**

Herbert Burgunder, III & Peter Prevas (Prevas & Prevas, Law Office of Herbert Burgunder, III, on brief) Baltimore, MD, for appellant.

Michael J. Salem, Annapolis, MD & J. Carroll Holzer, Towson, MD (Holzer & Lee, Douglas F. Gansler, Atty. Gen., on the brief) for appellee.

Panel: MEREDITH, WOODWARD, ZARNOCH, JJ.

ZARNOCH, J.

## STATEMENT OF THE CASE

This case concerns a long-running dispute between a Baltimore City restaurant and its neighbors.[1] Appellants YIM, LLC ("YIM"), Richard D'Souza, and the Board of Liquor

---

1. The dispute over this property has already resulted in one published opinion. *See Tuzeer v. YIM, LLC,* 201 Md.App. 443, 29 A.3d 1019 (2011), *cert. denied,* 424 Md. 293, 35 A.3d 489 (2012) (affirming decision by Board of Municipal and Zoning Appeals permitting continued use of the property as a restaurant).

License Commissioners for Baltimore City ("Liquor Board" or "Board") appeal the judgment of the Circuit Court for Baltimore City overruling the Liquor Board's transfer of a liquor license to D'Souza. Appellees and cross-appellants M. Hasip Tuzeer et al. ("Neighbors") appeal the circuit court's judgment that the liquor license is still active and that the Board had the authority to reconsider an earlier decision it made denying the license transfer.

We conclude that the liquor license was still active and therefore subject to transfer. We also find that the Board had the authority to both accept transfer and renewal applications for the license and reconsider its decision to deny the license transfer. However, we remand to the Board for further factfinding on whether D'Souza complies with the requirement that an applicant for a license be a taxpayer of Baltimore City and for consideration of a newly enacted law that affects the requirement that applicants be registered voters.

## FACTS AND LEGAL PROCEEDINGS

### I. Factual Background

YIM owns a property at 123–129 West 27th Street in Baltimore City that has been used as a restaurant for over fifty years. This property comprises two separately addressed but attached buildings: 127 West 27th Street, where the disputed restaurant is located, and 123 West 27th Street, which houses a bakery run by D'Souza.[2]

Two Sisters, LLC ("Two Sisters") rented 127 West 27th Street from YIM in 2007 and operated a restaurant there. It applied for and received its 2007 liquor license, for May 1, 2007 to April 30, 2008.[3] However, Two Sisters did not apply to renew this license before April 30, 2008. On May 22, 2008,

---

2. The property was originally made up of four rowhouses, which were combined to form a single unit. *Tuzeer*, 201 Md.App. at 449, 29 A.3d 1019.

3. With certain exceptions, all liquor licenses expire on April 30 following their issuance. Md.Code (1957, 2011 Repl Vol.), Art. 2B, § 10–

the Liquor Board wrote Two Sisters and informed it that the Board had "not received or processed a 2008 renewal application for your location." The same letter indicated that "Article 2B, Section 10–504(d) provides that when an establishment has been closed for 180 days ... the license dies by operation of law." [4] Two Sisters subsequently closed and vacated the premises on May 30, 2008. The Liquor Board sent Two Sisters another letter on August 5, 2008, in which it notified the entity that the liquor license "has not been renewed and will not be renewed until there is a payment of the $1,500 late fee." The Board advised Two Sisters that it must "resolve the status of this license and at least file a 2008 renewal application" if it was interested in selling the liquor license.

Counsel for YIM [5] and Two Sisters filed a Petition for Hardship Extension on October 27, 2008. The Liquor Board held a hearing on the hardship extension request on December 11, 2008, and granted an extension of the life of the license for 180 days from December 11.

Two Sisters also submitted a license renewal application in late October 2008, which the Liquor Board received on or

---

206(a). Unless otherwise provided, all subsequent references in the Maryland Code are to Article 2B.

4. Section 10–504(d)(2), which applies only in Baltimore City, provides:
 180 days after the holder of any license issued under the provisions of this article has closed the business or ceased active alcoholic beverages business operation of the business for which the license is held, the license shall expire unless:
 (i) An application for approval of a transfer to another location or an application for assignment to another person pursuant to § 10–503(d) of this subtitle has been approved or is then pending:
 (ii) An application pursuant to § 10–506 of this subtitle has been approved or is then pending; or
 (iii) A written request for a hardship extension, as provided in this subsection, is filed within the 180–day period.

5. The record before the Court does not indicate whether YIM had any interest in Two Sisters' business and liquor license, apart from being its landlord. YIM's continued involvement and presence as a party in this dispute has not been challenged. We assume without deciding that YIM qualifies as an "appropriate interested part[y]" in these proceedings. Art. 2B, § 10–504(d)(3).

about October 31, 2008. Some time after the application, Two Sisters received a license for May 1, 2008 to April 30, 2009.[6] However, the fees for the 2008 were apparently paid late. In March 2009, the Board informed counsel for YIM and Two Sisters that "it is necessary that all outstanding 2008 license fees be paid before a renewal application will be accepted for this location." The Board sent YIM's counsel another letter on May 29, 2009, in which the Board wrote that "we cannot verify payment of the 2008 license fee." The 2008 license fee was eventually paid on June 1, 2009.

Two Sisters next filed a Transfer Authorization on February 18, 2009, to transfer its liquor license to Mid Atlantic Capital Holding ("Mid Atlantic"), another restaurant operator that was planning to open a restaurant at 127 West 27th Street. Neither Two Sisters nor Mid Atlantic had filed a renewal application by the following month, and so in a letter dated March 26, the Board reminded counsel for YIM that no action had been taken on the liquor license since the December 11 hearing. The Board indicated that "the renewal application must be in this office by March 31, 2009." Two Sisters subsequently filed a 2009 renewal application for the liquor license.[7] On April 21, 2009, Mid Atlantic also submitted an application to the Board for a liquor license at 127 West 27th Street.

A conference on the Two Sisters–Mid Atlantic license transfer was scheduled before the Board for June 4, 2009, but was postponed at the parties' request.[8] Counsel for YIM next filed a second hardship extension request on June 8, 2009. The summer apparently passed without any further progress on

6. The copy of the license in the record does not indicate when the license was actually issued.

7. The application was notarized on April 3, 2009, but there is no filing or receipt date.

8. The record indicates that at least one community organization did not approve of Mid Atlantic's involvement in 127 West 27th Street and opposed its acquisition of a liquor license. This opposition apparently led to the postponement of the hearing.

the license transfer, and on September 30, 2009, the Board inquired about the status of the license in a letter to Mid Atlantic. The Board wrote that "if we do not hear from you within the next ten (10) business days, your application will be voided. Since this is an inactive license, this would mean that this license will expire by operation of law." There was apparently no further action on the license on behalf of Mid Atlantic.

Instead, on October 13, 2009, D'Souza filed an application for a liquor license on behalf of Gluten Free, LLC ("Gluten Free") for 127 West 27th Street. He also filed an application to transfer the liquor license from Two Sisters on November 13, 2009, as well as a license renewal application on March 24, 2010. On March 31, 2010, counsel for YIM submitted a Transfer Authorization form signed by the owners of Two Sisters.

## II. Liquor Board Hearings

Once all the parties were in place, following D'Souza's substitution on the roster, they then proceeded to have three hearings before the Board.

### A. May 27, 2010 Hearing

The first hearing on May 27, 2010, "concern[ed] the status of" Two Sisters' liquor license "where a transfer to [D'Souza] at the same location is pending." The Board heard argument from the Neighbors, the Charles Village Community Association ("CVCA"), YIM, and D'Souza, as well as testimony from two witnesses on behalf of the Neighbors.

The Neighbors' position was that the license was "dead" and not subject to transfer because it automatically expired 180 days after Two Sisters ceased doing business at the property on May 30, 2008. *See* Art. 2B, § 10–504(d)(2). The Neighbors also asserted that the license issued for May 1, 2008 to April 30, 2009, was a "phantom license" that could never have been issued to Two Sisters because of the entity's tax prob-

lems.[9] They argued that the various documents reflecting approval of the license were fraudulent and that the license was dead. They further argued that the substitution of D'Souza for Mid Atlantic on the transfer application could not toll the hardship extension period for the license and that the subsequent transfer application from D'Souza was thus late under § 10–504(d)(6).[10]

D'Souza countered that the license was still active because YIM submitted a hardship extension request within 180 days of May 30, 2008, on October 27, and filed a transfer application on April 21, 2009, within 180 days of the Board's granting of the hardship extension on December 11, 2008. He argued that the amendment of the transfer application, by replacing Mid Atlantic with his application, continued to toll the hardship extension period and kept the license alive.

At the conclusion of argument from all parties, the Board found the following:

> We at this time believe that the following facts were never in dispute. There was a hardship extension request hearing held here in City Hall in Room 215 on December 11th, 2008, wherein the Board granted a 180 day extension from that date for the transfer—that is for the transfer of the license. There was some conflicting testimony as to what date the original hearing extension—a hardship extension request had been filed. [Counsel for YIM] is here and indicated it

---

**9.** On February 15, 2008, the Liquor Board informed Two Sisters that it would hold any future 2008 renewal license until Two Sisters resolved a delinquent sales tax payment issue with the Comptroller's Office. Shortly thereafter, on February 25, the Liquor Board informed Two Sisters that its charter was not in good standing and that its "2008 renewal license [would] be held until [it] present[ed] a certificate of good standing from" the State Department of Assessments and Taxation. The Board apparently resolved these issues when it accepted the renewal fees.

**10.** Section 10–504(d)(6) states:

> If an application or request to the Board described in paragraph (2) or (3) of this subsection is withdrawn, there shall be no tolling of the period for automatic expiration of the license and it shall be deemed as if no such application or request was filed.

was filed October 27th, 2008. That's six weeks prior to the December 11th, 2008, hardship extension request hearing. That would seem to be a reasonable date that that was filed. It is uncontroverted, I believe, that the premises did close on or about May 30th, 2008. It is also not controverted that April 21st, 2009, a[n] application to transfer this license was indeed filed. It was filed in the name of David Weishaus and Kelly [McNamee] [for Mid Atlantic].

There was a June 4th, 2009 scheduled transfer conference before this Board. The hearing was postponed at that time for an opportunity for both sides to meet. There was never a public hearing again on the transfer conference for reasons not fully in our realm of understanding. But, for whatever reason, the transfer conference did not go through.

June 8th, 2009, we have [YIM] and our own court file with the filed stamped "copy" in our file indicating what looks like a carbon copy, second hardship extension request filed on or about June 8th. The Board believes that that is a— that that would be a consistent action on the part of [YIM's counsel], that is, a June 4th hearing where [the parties] asked to step back and talk, and out of an abundance of caution, [counsel] files a second hardship extension request on June 8th just in case the negotiations break down and the license is—the transfer is denied, that he would have a backup to keep the license alive.

The Board then ruled on two issues: the viability of the license and whether YIM withdrew or amended its application for a license transfer when it sought to replace Mid Atlantic with D'Souza. It concluded:

One is[:] was there an opportunity for this license to die from May 30th, 2008 up until June 2009. And the Board believes that by the filing of the first hardship extension request, by the Board granting 180 days on or about December 11 th, 2008, and by the subsequent filing of both or either the transfer application on April 21st with a second hardship extension on June 8th, that in both cases the

license was certainly alive under those circumstances, in our petition [*sic*], based on 10–504(d)(2)(i) and (ii) and (iii). The next issue comes to the issue of a withdrawal of a petition. Based on [YIM's counsel's] argument, he filed an amendment to the application in good faith when dealing with the Community Association to remove an objectionable owner rather than—the petition was not withdrawn, it was amended. That's what the Board finds, that the petition was not withdrawn by the October 13th, 2009 amendments thereto. So the Board finds there was no withdrawal of the petition, just an amendment, and that under 10–504(d), and the Board's determination of December 11th, 2009, that this license, as a matter of law, is active.

The Neighbors filed a petition for judicial review of the Board's decision in the circuit court on June 28, 2010.

### B. June 24, 2010 Hearing

The Liquor Board held a second hearing on June 24, 2010, this time about D'Souza's application to transfer ownership of the liquor license "where [the transferor] establishment has been closed for more than 90 days."

The Neighbors first raised several preliminary motions: "a motion to dismiss the October 13, 2009, [and] the April 21, 2009 transfer applications, a motion to strike the March 2010 renewal application, a motion to strike the March 2009 renewal application, [and] a motion to strike the June 8, 2009 hardship extension request." They argued that "fraud and total misrepresentation" tainted all of the applications. The Board denied all of these motions.

The Neighbors' arguments at the hearing centered on the lack of neighborhood support for the liquor license and the deficiencies of the license applications. They called over a half-dozen witnesses who testified extensively about their concerns about the restaurant receiving a liquor license, particularly regarding the restaurant's operating hours, the potential for crowds, and the effect on parking in the area. Regarding the alleged deficiencies in the applications, the Neighbors

argued that the October 13, 2009 transfer application was "noncompliant" because neither D'Souza nor his co-applicant [11] "identifie[d] any property on which he pays taxes in his individual name as required by Article 2B," nor did the application list which applicant is a city taxpayer. *See* § 9–101(c).

The Neighbors also asserted that both the Baltimore City and Baltimore County Boards of Elections had failed to locate D'Souza "anywhere on the voting rolls of the State of Maryland." A witness for the Neighbors testified that she had obtained a copy of the voter registration lists for the legislative district that covers D'Souza's home address. She said that she had printed the alphabetical listing of voters from the end of the letter C to the beginning of the letter E and that D'Souza's name was not on the list. However, the Board chairman later stated that he did not take the voter registration lists as seriously as the Neighbors did because, in essence, he did not find them reliable. He explained that he had purchased a similar list before, when he ran for office, and that the list "was terrible. People had died 10 years ago, I went and knocked on their door, people who had never lived there."

D'Souza testified that although he had not registered to vote, he believed that he had been registered automatically once he became a United States citizen.[12] When asked to confirm that he asserted on his license application that he was a "resident or taxpayer of Baltimore City for more than two years," D'Souza stated that this information was still true. On cross-examination, however, he admitted that he did not know if he was registered to vote as of that date and that he had never voted. He also testified that he resided at his home with his wife, in whose name the property was listed. He

---

11. At the time of the application, the co-applicant, Kenneth Moore, was a 50 percent owner of Gluten Free. Moore withdrew from the business and the application before the hearing.

12. D'Souza became a naturalized United States citizen in October 2009.

stated that he did not pay property tax in his own name, though he also testified that he paid "Maryland personal property taxes, federal taxes, FICA, all that" for both the bakery business that he owned and another warehouse facility in Baltimore City.

D'Souza introduced copies of 47 emails in support of his restaurant, as well as about 1,000 signatures in support of his liquor license application. He testified that he was familiar with the neighborhood because of the bakery he already operated there and that many of the neighbors supported his application. These same "neighbors want[ed] [him] to open the [restaurant] so they could sit down and eat" and signed a petition in support of his application. D'Souza explained that he "want[ed] to do right by the neighbors" and work with them to get them to support his restaurant. However, on cross-examination, D'Souza also testified that he had not made any compromises when it came to dealing with the neighborhood and that he had not committed to limiting the restaurant's hours, as requested by the neighborhood association. In fact, D'Souza testified that he was not willing to accept any limitations on the restaurant's operating hours.

Following argument from all parties, the Board summarized the facts presented at the hearing and made an oral ruling:

We hear that there could be parking problems and noise problems as testified to by Sharon Guida from the community. We understand that Mr. D'Souza was willing to put in security. We believe that there is a unique service and product to be offered by Mr. D'Souza's business . . . .

We don't dispute that if you're going to be open until 2 a.m. you're probably going to sell more alcohol than food, but we hear it again and again . . . that parking is a continuous problem.

. . .

The proximity to Hopkins certainly makes the Board believe that a young crowd could be attracted to the bar. We have the issue, therefore, as to what we believe is the issue in this case is there a public need and desire for this license. . . .

We have to determine what is the public need and what is the public desire. We cannot determine that there is a public need and desire at this point for this transfer to occur.

I also want to note that Mr. D'Souza—he said it, I wrote it down, I didn't make it up—he said, I've given them a chance to support us—and he was asked and cross-examined by [counsel for the Community Association]—but he said about the community associations, I've given them a chance to support us. And then he said, I've given them four chances. And then he said, I want to do it right by the neighbors. I'm afraid that that—that attitude might be incendiary. I don't know if he's upset because he believes that he's given the neighbors—he's done everything they've asked and still they won't, they won't give him a blessing or if his attitude turned the neighbors off long ago. But he's said specifically I've given them a chance to support us and I—and this Board believes it should be the other way around. And that is the business—or the community should be the ones getting the benefit of the doubt.

They're—the licensees are in fact in business to make money; that is undisputed. And we believe that, based on what we have in the record, the letters from the community associations—community associations represent hundreds, sometimes thousands, of residents. And if they don't speak for the public, then who does?

Based on the testimony and exhibits, therefore, we do find that we do not determine a public need and desire for this license. We will fail—we will deny the transfer in this case. . . .

As I say, we have easily conceded the uniqueness of products. We do determine on the fourth factor, that the parking has been testified to all day and we don't live on Howard Street and 27th. And we're not going to substitute our parking judgment for them, for the neighbors. The neighbors have unequivocally testified that parking is a nightmare in that neighborhood.

When asked to clarify what statutory base the Board was relying on, one of the commissioners said "10–202(a), public need and desire." [13]

On July 2, 2010, the Neighbors sought judicial review of the Board's decision in the circuit court. On July 15, 2010, counsel for D'Souza and Gluten Free sent the Board a letter requesting that it reconsider the decision denying the transfer application. The letter focused on the community support for the liquor license, particularly if D'Souza agreed to time restrictions on the sale of alcohol. The Neighbors opposed the request for reconsideration in a letter on July 26, arguing

---

**13.** Section 10–202(a)(2) provides:

(i) Before approving an application and issuing a license, the board shall consider:
1. The public need and desire for the license;
2. The number and location of existing licensees and the potential effect on existing licensees of the license applied for;
3. The potential commonality or uniqueness of the services and products to be offered by the applicant's business;
4. The impact on the general health, safety, and welfare of the community, including issues relating to crime, traffic conditions, parking, or convenience; and
5. Any other necessary factors as determined by the board.
(ii) The application shall be disapproved and the license for which application is made shall be refused if the Board of License Commissioners for the City or any county determines that:
1. The granting of the license is not necessary for the accommodation of the public;
2. The applicant is not a fit person to receive the license for which application is made;
3. The applicant has made a material false statement in his application;
4. The applicant has practiced fraud in connection with the application;
5. The operation of the business, if the license is granted, will unduly disturb the peace of the residents of the neighborhood in which the place of business is to be located; or
6. There are other reasons, in the discretion of the board, why the license should not be issued.
(iii) Except as otherwise provided in this section, if no such findings are made by the board, then the application shall be approved and the license issuing authority shall issue the license for which application is made upon payment of the fee required to the local collecting agent.

that the Board's June decision was final and not subject to reconsideration.

## C. August 12, 2010 Hearing

The Board ultimately scheduled a hearing on August 12, 2010 to consider the motion for reconsideration.

The Neighbors first argued that the hearing should not proceed, claiming that the Board did not have jurisdiction to reconsider the application. They asserted that because there had already been an appeal to the circuit court over the June hearing, the Board could not reconsider anything. The Board denied the Neighbors' motion, finding that its June 24 decision was "not a final decision." According to the Board, because that decision was not final, the Board retained jurisdiction to hear a motion for reconsideration. The Board also determined that D'Souza was not prevented from seeking reconsideration under § 10–208(c),[14] which would otherwise impose a six-month restriction on re-application, because the June 24 decision was not final. The Board also rejected the Neighbors' motion for a stay on the grounds that the circuit court and this Court were considering the issue. The Board found that the petitions for judicial review were filed prematurely and therefore did not divest it of jurisdiction.

D'Souza advised the Board that since the June 24 hearing, he had entered into an agreement with two of the community associations regarding the operating hours for the restaurant. The Board received a copy of the agreement, which indicated

---

**14.** Section 10–208(c) states:

 (1) This subsection applies only in Baltimore City.

 (2) A class of license for which application was previously made for the retail sale of alcoholic beverages may not be issued to any person who has been refused the issue of any such class of license, nor to or for any premises for which a license has been so refused, within a period of six months from the refusal by the Board of License Commissioners or by the Circuit Court, as the case may be.

 (3) The restriction against the issue of a license to or for any premises is not effective if in the judgment of the Board of License Commissioners the refusal was directed against the person or persons applying for the prior license, and not against the premises in question.

that D'Souza's restaurant would stop selling alcohol at 10:30 p.m. on weeknights and 12:30 a.m. on weekends. The agreement also required D'Souza to get the community associations' permission to add any other operator or manager to the establishment.

After a brief hearing, the Board ruled on the motion to reconsider:

The Board did in fact consider the motion of [D'Souza's counsel] which was timely filed before the 30 day period. The Board's decision was not a final one, it does have the power to exercise revisions to its interim orders.

Based upon the petition—it was pointed out to us after a 4-1/2 hours hearing on this very matter, we have deliberated for about 5 minutes before denying it, the request—we really did not get a chance to completely delve into the numerous petitions, both for and against the request. Of note though, were the petitions, although pointed out by counsel in closing arguments at the June 24th hearing, a lot of community support within the neighboring 3 blocks was on this petition. It was buried within and it was difficult for the Board to piece together. On reconsideration, obviously, a motion was filed with—highlighting the neighbors with the most proximity to the proposed location.

The Board also considered, and [YIM] argued, the really extreme unique nature of services and products to be offered by this business. This Board is required under 10-202(a) to in fact consider such requests. We routinely grant licenses where potential uniqueness may be dubious. Beer is beer, wine is wine, liquor is liquor. Not in this case. In this case, gluten-free products, including gluten-free alcohol, may not be available anywhere else in the city or the region. So we see an extreme uniqueness of products to be offered.

With the only piece of new evidence that was submitted today, which we consider a stipulation, or at least an agreement—a stipulation between three of the parties and their attorneys involved—we've accepted an agreement from Charles Village Civic Association, Greater Remington Im-

provement Association, and the property owner of 127 West 27th Street. Therein, the Licensee, Mr.—or the Applicant, Mr. D'Souza, has agreed that he will stop the sale and service of alcohol at 10:30 p.m. on Sunday nights through Thursday nights, no new patrons entering after 11, and the premises being shuttered by 11:30. He's also agreed that there will be no alcohol sold or served after 12:30 a.m., and that the premises will be shuttered by 1:00 a.m. with no patron re-entry. . . .

Based on all those facts, the Board does in fact reconsider [its] decision of June 24th, 2010, finding by the agreement . . . and the petition which was in evidence at the original hearing, that there is a public need and desire, a *de minimis* impact on existing licensees, a negligible impact on general health, safety and welfare, including crime, traffic and parking, and certainly a potential uniqueness of services and products.

So we will grant this transfer application to Mr. D'Souza subject to the strict enforcement of the terms and conditions of the agreement between CVCA, GRIA and the property owner and Licensee at 127 West 27th Street.

The Neighbors filed a petition for judicial review of the Board's decision in the circuit court on August 20, 2010.

### III. Circuit Court Actions

The three petitions for judicial review were consolidated into a single action at the circuit court. The court heard additional evidence in the form of testimony from Jane Schroeder, the executive secretary for the Liquor Board. She testified regarding the Board's practices and procedures, particularly with regard to the renewal process for licenses and the Board's practice of automatically preparing licenses each year but not releasing them until all the appropriate fees and paperwork were in order.

After hearing argument from all parties, the court concluded that the liquor license was still active and subject to transfer; that although the Board's order from June 2010 was final, the six-month restriction on reapplying in § 10–208(c)

applied only to new license applications, not transfer applications like D'Souza's; and that the Board's decision to grant the license transfer was invalid because there was not substantial evidence of D'Souza's compliance with the voter registration requirements of § 9–101(c).[15] The court expressed no view on the issue of whether D'Souza was a taxpayer of Baltimore City as required by this provision. The court also observed that "[c]ounsel for [D'Souza] argued that [§ 9–101(c) ] violates the equal protection clause of the United States Constitution, but no authority for this argument was submitted." YIM, D'Souza, and the Neighbors each filed Motions to Alter or Amend Judgment, and all of the motions were denied.

YIM filed a Notice of Appeal on June 29, 2011. D'Souza filed his own Notice of Appeal on July 18, 2011, and the Neighbors filed a Notice of Cross–Appeal on July 21, 2011.

## QUESTIONS PRESENTED

Given that the parties cannot agree on whether the subject of this appeal, the liquor license for 127 West 27th Street, is alive or dead, it is no surprise that they present radically different descriptions of the issues before this Court. Appellants YIM, D'Souza,[16] and the Liquor Boards [17] focus on the

---

15. Section 9–101(c)(1) states:

> (i) Except as provided in subparagraph (ii) of this paragraph, if the application is made for a limited liability company, the license shall be applied for by and be issued to 3 of the authorized persons of that limited liability company, as individuals, for the use of the limited liability company, at least 1 of whom shall be a registered voter and taxpayer of the country or city, or the State when the application is filed with the Comptroller, and shall also have resided there at least 2 years before the application.
> (ii) In Baltimore City, an authorized person of a limited liability company who holds an alcoholic beverages license for the use of the limited liability company that was granted on or before June 1, 2012, need not be a registered voter in Baltimore City.

Subparagraph (ii) was enacted in 2012, Chapters 532 and 533, *Laws of 2012*, and obviously was enacted as a result of the circuit court decision in this case. *See* Section V.(B), *infra*.

16. YIM and D'Souza present two questions for review:

validity of the Board's decision to grant the license transfer, and D'Souza contends that the voter registration requirement is unconstitutional. By contrast, the Neighbors,[18] as cross-

---

1. Did the Circuit Court for Baltimore City err when it reviewed the evidence before the Liquor Board and came to a different conclusion from the Liquor Board?
2. If all liquor licenses must be issued to individuals, does it violate the equal protection requirements of the due process clause if some individuals are required to be registered voters while others are not?

17. The Liquor Board, as appellee, also presents two questions for review:

1. Was the Liquor Board's decision, that the liquor license was an existing and viable license that was subject to transfer supported by substantial evidence where the license was renewed after its statutory expiration date in accord with statute and the long-established practice of the Liquor Board, the Liquor Board granted a timely-filed hardship application, and an application for transfer was filed before the expiration of the hardship extension period?
2. Should this case be remanded for the Liquor Board to consider the impact of a new law that eliminated the requirement that the holder of a liquor license in Baltimore City be a registered voter?

Because YIM and D'Souza invite us to consider the impact of the new law, we need not decide whether the Board could raise its second question without appealing the circuit court's decision.

18. The Neighbors present six questions for review, in multiple parts:

1. Did the Board have the authority to accept a renewal application on October 31, 2008 under the license expiration and renewal provisions of Article 2B?
A. Did the annual license expiration and renewal provisions of § 10–206(a) and § 10–301 authorize the acceptance of a renewal application on October 31, 2008?
B. Did the provisions of § 10–504 authorize the acceptance of a renewal application on October 31, 2008?
2. Did applications filed on April 21, 2009 and October 13, 2009 prevent license expiration under § 10–504(d)?
A. Did the April 21, 2009 application of Mid Atlantic Capital Holding, LLC toll the expiration period and facilitate the October 13, 2009 application of Gluten Free LLC?
B. Did the October 31, 2009 application of Gluten Free LLC toll the expiration period?
3. Did the Board have the authority on August 12, 2010 to reconsider and reverse its June 24, 2010 refusal to issue the license?
4. Was the Board's reversal of its June 24, 2010 ruling without substantial evidence, arbitrary and capricious, and a violation of due process?

appellants, vigorously dispute the existence of any liquor license for 127 West 27th Street since April 30, 2008, and challenge many of the actions the Board has taken. For these reasons, we have consolidated and recast the various issues presented and address the following:

1. Did the expiration of the 2007–08 license on April 30, 2008, preclude the Board from considering a renewal application filed in October 2008?

2. Did the Board err by accepting incomplete liquor license applications and permitting later amendments of those applications?

3. Was the Board authorized to accept the license renewal applications filed in 2009 and 2010?

4. Did the Board have the authority to reconsider its June 2010 decision, and was its subsequent reversal of that decision supported by substantial evidence?

5. Do the requirements of § 9–101(c) that an applicant be a registered voter and a taxpayer in Baltimore City prevent D'Souza from receiving a liquor license?

6. Is the registered voter requirement unconstitutional as a violation of equal protection of the laws?

7. Are the Neighbors entitled to the costs of preparing the transcripts from the Board's hearings?

We find that: (1) the expiration of the 2007–08 license did not preclude the Board from considering a renewal application; (2) the Board was authorized to accept incomplete applications and amendments of those applications; (3) the Board was likewise authorized to accept license renewal applications; (4) the Board had the authority to reconsider its June 2010 decision and the subsequent reversal of that decision was supported by substantial evidence; (5) further Board action is

---

5. Did the "renewal applications" filed in 2009 and 2010 toll the expiration period or facilitate later applications?

6. Are the Neighbors entitled to the costs of preparing the transcripts of the Board's proceedings on June 24, 2010 and August 12, 2010?

necessary to consider a new law on the registered voter requirement of § 9–101(c) and to determine D'Souza's compliance with the city taxpayer requirement of § 9–101(c); (6) D'Souza did not preserve the equal protection argument, nor does he have standing to raise it; and (7) the Neighbors are not entitled to the costs of preparing the transcripts.

## STANDARD OF REVIEW

The standard for appellate review of an administrative agency decision differs depending on whether agency factfinding or law determinations are under attack. Where a factual question or a discretionary judgment is concerned, the reviewing court will uphold an agency's decision so long as it is "supported reasonably by substantial evidence." *HNS Dev., LLC v. People's Counsel,* 425 Md. 436, 449, 42 A.3d 12 (2012) (Internal quotations and citations omitted). Review of an agency's conclusions of law is less deferential but often gives "considerable weight" to "an administrative agency's interpretation and application of the statute which the agency administers" as well as respect for "the expertise of the agency in its own field." *Thanner Enters., LLC v. Balt. County,* 414 Md. 265, 275, 995 A.2d 257 (2010) (Internal quotations omitted). When a statute is subject to more than one interpretation, we "generally give[ ] considerable weight to the agency's view" and implementation of the ambiguous statute. *Opert v. Crim. Injuries Comp. Bd.,* 403 Md. 587, 593–94, 943 A.2d 1229 (2008).

## DISCUSSION

Because the parties disagree on the validity of many Board actions taken at nearly every step of the process, determining the status of the license first requires untangling all of the threads of this dispute.

The Neighbors argue that the license for 127 West 27th Street expired as a matter of law in April 2008 and that any Board action taken to extend the life of the license was invalid. Accordingly, they contend that the Board did not have the

authority to accept the various renewal and transfer applications in October 2008 and April and October 2009. They further assert that, even if the license did not expire, the renewal applications filed in 2009 and 2010 were inadequate and could not toll the expiration period for license renewals. They also contend that the Board's decision denying the transfer in June 2010 was final, precluding its reconsideration of the decision in August 2010, and that the subsequent reversal of the June 2010 ruling was not supported by substantial evidence. Finally, the Neighbors assert that they are entitled to the costs of preparing the transcripts of the Board's proceedings on June 24, 2010 and August 12, 2010.

YIM, D'Souza, and the Board focus their arguments on the circuit court's review of the Board's actions. They assert that the Board's decision was supported by substantial evidence and that the circuit court erred when it reviewed the evidence before the Board and reached a different conclusion on the issue of D'Souza's voter registration status. D'Souza and YIM also argue that the voter registration requirement violates equal protection. Although the Board makes no arguments on the merits of this constitutional contention, it asserts that this case should be remanded to the Board so that it can consider the impact of a new law that appears to eliminate the voter registration requirement for a Baltimore City licensee like D'Souza.

## I. Life of the License

We first consider whether the 2007–08 license "died" when it expired by statute on April 30, 2008.

### A. Statutory Framework

Several provisions of Article 2B apply to a situation like this one, where an ostensible license renewal application is submitted on behalf of a business that is no longer active. First, a license-holder seeking to renew a liquor license "shall, not less than 30 nor more than 60 days before the first day of May of each and every year, file a written application ... for the renewal of the license." § 10–301(a)(1)(i). In other words,

renewal applications should be submitted between March 1 and March 31. § 10–301(j)(2)(i) (local Baltimore City renewal provisions). In Baltimore City, the Board may reject or charge a fee of $50 per day, up to $1500, for late applications. § 10–301(j)(2)(iii).

Separate statutory provisions apply when a license-holding business closes or vacates the premises. The general rule is that a license expires ten days "after the holder of any license ... has vacated, or been evicted from the premises for which the license has issued ... unless an application for approval of a transfer to another location or assignment to another person ... has been approved or is pending." § 10–504(a). In Baltimore City, however, other provisions apply. A Baltimore City license expires 180 days after "the holder of any license ... has closed the business or ceased active alcoholic beverages business operations" unless:

(i) An application for approval of a transfer to another location or an application for assignment to another person ... has been approved or is then pending;

(ii) An application [for continuation of the business following the death of the licensee] has been approved or is then pending; or

(iii) A written request for a hardship extension, as provided in this subsection, is filed within the 180–day period.

§ 10–504(d)(2). The licensee or "other appropriate interested parties" may also seek a hardship extension, which, if granted, may extend the license up to "360 days after the date of the closing or cessation of alcoholic beverages business operations of the business." § 10–504(d)(3); *see also* § 10–504(d)(4) (after finding that undue hardship exists, "the Board may grant an extension of the life of the license for a time period not to exceed 360 days").

Perhaps recognizing that the local Baltimore City provisions of § 10–504(d) might complicate interpretation, the Legislature set out its intent in paragraph (5):

It is the intent of this subsection that the total time period for which a license may be deemed unexpired ... is 180

days if no undue hardship extension is granted, and no more than 360 days if an undue hardship extension has been granted. The time period begins at the earlier of the closing of the business or cessation of alcoholic beverages business, and shall be tolled only upon the filing of a [transfer application or hardship extension request], the expiration period to begin running again, cumulatively to the time period before the filing of the application or request, upon the occurrence of the later to occur of the following events:

> (i) Final action of the Board granting or denying a [hardship extension] request;
>
> (ii) Final action of the Board denying [a transfer] application . . .; or
>
> (iii) Final judgment of the appellate court when judicial review of the Board's action on [a hardship extension request or transfer] application . . . has been sought, or on dismissal of a petition for judicial review.

The time periods are thus tolled if an application for transfer or a hardship extension request is pending. § 10–504(d)(5). The time periods expire upon the later of final action by the Board on a hardship extension request or a transfer request, or final judgment of the appellate court when judicial review is sought. §§ 10–504(d)(5)(i)–(iii).

## B. The Parties' Contentions

The Neighbors' position is that the Board lacked all authority to renew the license. First, they argue that the hardship extension provisions of § 10–504(d) do not apply to 127 West 27th Street because there was no license to transfer or grant a hardship extension for once the 2007–08 license expired. They next assert that even if § 10–504(d) applies, it is abrogated by the automatic ten-day expiration procedure of § 10–504(a), meaning that the license expired ten days after Two Sisters vacated the premises on May 30, 2008. Finally, they contend that the late fee provisions of § 10–301(j)(2) cannot "cure" a late application.

The Board argues in response that § 10–504(d)(2)(iii) "expressly permits a license in Baltimore City to be extended by a hardship application filed within 180 days after the cessation of active alcoholic beverages operations."[19] It also disputes the Neighbors' contention that § 10–504(a) overrides § 10–504(d), arguing that the local provisions of § 10–504(d) should prevail over the general provisions of § 10–504(a). Finally, the Board relies on its express statutory power to impose a fine on late applicants (instead of rejecting the application) and its longstanding practice of accepting late applications as support for its assertion that applications are not dead even if they are not filed by April 30. Indeed, the Board asserts that it has not "rejected a liquor license renewal application because it was not filed in a timely manner" since 1981.

### C. Analysis

 The Neighbors and the Board present different interpretations of several provisions of Article 2B, making this a question of statutory construction. Analysis of a statute frequently requires consideration of three factors: (1) text; (2) purpose; and (3) consequences. *Buckley v. Brethren Mut. Ins. Co.*, 207 Md.App. 574, 584–85, 53 A.3d 456 (2012), *cert. granted*, 430 Md. 11, 59 A.3d 506, 2013 Md. LEXIS 68 (Jan. 18, 2013).

Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. An examination of interpretive consequences, either as a comparison of the results of each proffered construction or as a principle of

19. Although the Board does not specifically argue the point, the fact that the Board accepted a hardship extension request for the license in October 2008, when the license expired by statute on April 30, 2008, indicates that it interprets its power to grant an "extension of the life of the license due to undue hardship" to apply even when a licensee has not applied for renewal of the license in a timely fashion.

avoidance of an absurd or unreasonable reading grounds the court's interpretation in reality.

*Id.* at 585, 53 A.3d 456 (Citations omitted). When evaluating the text, purposes, and consequences, "we presume that the [l]egislature has acted with full knowledge of prior legislation, and construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Dep't of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 420, 918 A.2d 470 (2006). However, we do not permit a "patent drafting error" to frustrate the goal of a statute. *Kaczorowski v. Baltimore,* 309 Md. 505, 520, 525 A.2d 628 (1987).

### 1. § 10–504(a) versus § 10–504(d)

Section 10–504 deals generally with "vacation of premises" and contains general and local provisions that set out how and when a license expires if a licensee stops selling alcohol, closes the business, or vacates or is evicted from the premises. In Baltimore City, a "licensee or other appropriate interested parties" may file a hardship extension request with the Board, to extend "the life of the license due to undue hardship," for up to "360 days after the date of closing or cessation of alcoholic beverages business operations of the business for which the license is held." § 10–504(d)(4). Any hardship extension request must be filed within 180 days after the business is closed or has stopped selling alcoholic beverages. § 10–504(d)(2)(iii).

However, neither the exact nature of the relief afforded by the hardship extension nor the type of licenses to which it applies is fully detailed in the statutory scheme.[20] The Board's understanding of the relief that it may grant after

---

**20.** The Board's determination of what is "undue hardship" would appear to be governed by the rule set forth in *Philip Morris, Inc. v. Glendening,* 349 Md. 660, 678, 709 A.2d 1230 (1998), that where a statute gives discretionary power to an executive officer to be exercised upon his opinion of certain facts, the courts will not reverse that determination.

finding undue hardship apparently includes extending the life of an unexpired but inactive license—such as when a restaurant operator holds a valid license but stops selling alcohol—as well as an inactive and statutorily expired license, like the license in this case. Section 10–504(d) does not explicitly apply to licenses after their statutory expiration dates, but the Board's practice of applying the 180–day window to licenses after April 30, when combined with its practice of not actually issuing licenses until a licensee is in full compliance with all requirements, is neither "against the public interest" nor unreasonable under § 16–101(e).[21] The hardship provisions of § 10–504(d) therefore apply when a licensee seeks to extend the life of a license that has expired by statute, provided that the licensee makes the request within 180 days of the expiration date. Because Two Sisters filed a hardship extension request on October 27, 2008, exactly 180 days after Two Sisters ceased selling alcoholic beverages on April 30, 2008, the Board did not err by granting the request.

■ Finding that the hardship provisions of § 10–504(d) apply to this license, we now consider the Neighbors' argument that the general ten-day expiration period of subsection (a) for vacated premises overrides the Baltimore City provisions in subsection (d) for closed premises. We conclude that it does not.

First, we recognize that, by their terms, subsections 10–504(a) and (d) operate not in harmony but in dissonance. Subsection (d)'s allowance of 180 days after a Baltimore City business has closed or ceased selling alcoholic beverages—or 360 days if undue hardship is found—is inconsistent with the

---

**21.** Further, the sheer number of local exceptions to the general requirements in Article 2B, "no doubt developed over time with the aid of continuous special interest lobbying," make it "difficult to parse out just what the State's overall, regulatory scheme or intent is on certain subjects, except in the broadest and most obvious terms[.]" *Food Lion v. McCall*, 122 Md.App. 429, 435 n. 5, 712 A.2d 581 (1998). As part of the ongoing code revision process, the Alcoholic Beverages Article Review Committee has been meeting since September 2008 to resolve such problems.

shorter ten-day expiration period for license-holders that have "vacated, or been evicted from the premises" in subsection (a). § 10–504(a). Although subsection (a) has an explicit exception for Baltimore County, it does not have exceptions for any other localities. Reading subsection (a) alone, it thus appears that all liquor licenses automatically expire ten days after a license-holder vacates the premises. However, this does not take account of the separate provisions of subsection (d).

Article 2B provides initial guidance: local provisions prevail over the general rules when there is "conflict or inconsistency" between the two. § 1–103; *see also* Md.Code, (1957, 2011 Repl.Vol.), Art. 1, § 13 (when a public general law and a public local law are in conflict, the public local law shall prevail); *Farmers & Merchants Nat'l Bank v. Schlossberg,* 306 Md. 48, 63, 507 A.2d 172 (1986) ("It is well settled that when two statutes, one general and one specific, are found to conflict, the specific statute will be regarded as an exception to the general statute."). The preference for local statutes over general ones implicitly recognizes that, without such a policy choice, the local rules could easily be rendered mere surplusage in some circumstances. For example, if a Baltimore City license-holder applied for a license transfer or a hardship extension, under § 10–504(d), but had also vacated the premises, that license would automatically expire ten days after the premises were vacated, regardless of the pending application. Yet there is no legislative intent that the transfer and hardship extension provisions of § 10–504(d) only apply where the license-holder has *not* vacated the premises.

The legislative history related to the various vacation and closure provisions of § 10–504 provides little guidance. The first exception to § 10–504(a) was introduced in 1979, when legislation expressly exempted Baltimore County from the ten-day expiration period and instead applied a 180–day time period for license expiration in the event of vacancy or eviction from the licensed premises.[22] The first Baltimore City excep-

---

**22.** Chapter 304, *Laws of 1979.* The Fiscal Note that accompanied the legislation notes that the bill affects license life by "increas[ing it] to

tion came into effect in 1998,[23] with a law that permitted a license to be placed on "deposit"[24] with the Baltimore City Liquor Board for up to 180 days, if the licensee experiences "personal or financial hardship," has not been evicted from the licensed premises, and the premises are not used for any other business purpose. The new law also allowed for license expiration after 180 days if a transfer application was pending or had been approved. There were no amendments to § 10–504(a) and thus no exception for Baltimore City was written into that provision.

The current text of the Baltimore City exception in § 10–504(d) dates back to Senate Bill 128 of the 2000 session.[25] At a Senate Economic and Environmental Affairs Committee hearing on SB 128, Senator George W. Della, Jr., the bill's sponsor, explained that the purpose of the bill was to combat the practice of some license-holders of applying and getting approval for license transfers but not actually transferring the license. The bill as introduced reflected this narrower intent: the proposed language affected only the transfer provisions of § 10–503. However, an amendment to the bill expanded its reach to the business closure provisions of § 10–504(d). The legislative history does not shed light on the reason for the amendment. The text of SB 128 as passed essentially mirrored the exception for Baltimore County then in effect.[26]

Because of the identical nature of the City and County provisions, it appears that the Legislature intended for SB 128

---

180 days" after vacancy or eviction in Baltimore County and that "[t]his local bill is procedural in nature."

23. Chapter 166, *Laws of 1998.*

24. According to the Fiscal Note that accompanied the bill, "a licensee may put a license on deposit with the board with no limit on the number of days which the license can be held." Up until 1998, the Board held approximately "46–50" licenses each year.

25. Chapter 56, *Laws of 2000.*

26. § 10–504(e). *See generally* Chapter 557, *Laws of 1996* (enacting legislation for the current form of § 10–504(e)). The legislative history for this bill does not shed any light on the purpose behind this law.

to provide a different timeline for Baltimore City licenses than the generally applicable ten-day expiration period set out in § 10–504(a). Had the legislature explicitly included a Baltimore City exception, by amending subsection (a) to include Baltimore City, this conclusion would be undeniable. But the absence of an explicit exemption does not prevent us from concluding that subsection (d)—the Baltimore City provision— was intended to supplant subsection (a)—the general provision—when it came to Baltimore City licenses, just as § 10– 504(e) applies in Baltimore County but subsection (a) does not.[27]

Finally, the meaning of "vacated" in § 10–504(a) is not helpful to the Neighbors in this case. In *Rupinski v. Biel,* 43 Md.App. 635, 644, 406 A.2d 684 (1979), this Court found that vacation had occurred when the license-holder "removed all stock and inventory" and "leased the licensed premises to other businesses which were not related in any manner to an operation involving an alcoholic beverage license." Although Two Sisters left 127 West 27th Street on May 30, 2008, there was no evidence before the Board that they removed the restaurant fixtures when they left or that they had absolutely no intention of returning. Further, by seeking to transfer the license to a new restaurant tenant, Two Sisters was interested in a business "operation involving an alcoholic beverage license," *id.* at 644, 406 A.2d 684, taking over the location.

Thus, we conclude that a Baltimore City license expires 180 days after "the holder of any license ... has closed the business or ceased active alcoholic beverages business operations." *See* §§ 10–504(d)(2), (5). If a license-holder applies for and the Board grants an undue hardship extension request, that time period extends up to 360 days. *See* §§ 10–

---

27. The inclusion in a general provision of exception language for a subsection later added to the section is a drafting convention, sometimes followed and sometimes not followed in the Alcoholic Beverages law. The absence of such language from the general provisions is not a conclusive indicator of legislative intent when it is clear that the details of the local exception are inconsistent with those of the general provision.

504(d)(3)–(4). Subsection 10–504(a)'s ten-day expiration period does not apply in Baltimore City because the local provisions of § 10–504(d) prevail over the general terms of subsection (a).[28]

Therefore, Two Sisters' license did not expire ten days after it left the premises on May 30, 2008, because the Board accepted a hardship extension request within 180 days of Two Sisters' last day of active alcoholic beverages business, or April 30, 2008.

### 2. Late Fee Provisions of § 10–301(j)

Section 10–301(j)(2) permits Baltimore City to charge a late fee for a late application instead of rejecting the application. According to the Neighbors, the $1,500 cap on the $50 per day late fee means that an application cannot be more than 30 days late. The Board argues in response that the $1,500 cap is merely a cap, not indicative of a deadline, and suggests that this Court should defer to the Board's thirty-year history of accepting applications more than thirty days after the deadline.

Although the policy embodied in Article 2B states that "it is necessary to regulate and control the manufacture, sale, distribution, transportation and storage of alcoholic beverages within this State," § 1–101(a)(1), for the "protection, health, welfare and safety of the people of this State," *id.* at (4), the restrictive reading of § 10–301(j)(2) that the Neighbors advocate is not necessary to effectuate this intent. Nowhere does

---

**28.** Our conclusion that § 10–504(d) prevails over § 10–504(a) is bolstered by the legislature's treatment of a similar statutory exception for Allegany County. In 2005, Senate Bill 575 introduced § 10–504(h), which copied the Baltimore City and Baltimore County vacancy terms and applied them to Allegany County. The Floor Report for SB 575 noted that in "Baltimore City and Baltimore County, license holders have 180 days from the closing of the business or cessation of alcoholic beverage business before an alcoholic beverages license expires." This description of the applicable law in Baltimore City and Baltimore County suggests that the legislators viewed §§ 10–504(d) and (e) as applying in place of § 10–504(a) and that they intended for § 10–504(h) to do the same.

the statute mention a thirty-day deadline. Had the legislature wanted to impose such a deadline, it would have done so, in a clear and unambiguous manner. *Cf. Bd. of Liquor License Comm'rs v. Hollywood Prods.*, 344 Md. 2, 16–17, 684 A.2d 837 (1996) (noting that the "General Assembly's detailed regulation of the alcoholic beverages industry suggests that where [the General Assembly] intends a liquor board to have a particular enforcement mechanism at its disposal, it expressly provides for it by statute.").

Section 10–301(j) dates from Senate Bill 512, passed during the 1991 Session. The Senate Economic and Environmental Affairs Committee noted that despite an April 30 deadline, "many licensees submit their renewal applications late which makes it difficult for the Board to process all the applications in a timely manner." Bill Analysis, SB 512, 1991 Session. The Bill Analysis does not indicate that the Board *refused* late applications; rather, the Board struggled to keep up with the late applications it accepted. Accordingly, SB 512 sought to accomplish two things. First, it set a new window for timely applications and required that they be submitted between March 1 and March 31. Second, by giving the Board the authority to fine or reject late applicants, SB 512 "provide[d] an incentive for licensees to submit their license renewal applications in a timely manner." Nowhere in the bill's legislative history is there a discussion of a final and fixed "due date" for the applications.

 Section 10–301(j)(2) therefore does not impose a thirty-day deadline for late applications, nor does it preclude the Board from accepting a late application after April 30.[29]

---

**29.** Two bills introduced during the 2012 Session would have required the Board to reject renewal applications that were submitted after April 30. *See* House Bill 1363; Senate Bill 313. Neither bill passed. The House bill received an unfavorable report from the Economic Matters Committee, and the Senate Bill died in the Education, Health, and Environmental Affairs Committee. The Fiscal and Policy Notes suggests a reason for their lack of success: "The [B]oard advises that requiring a mandatory rejection of a late renewal can significantly impact license fee revenues and future economic development since the

### D. Conclusion

Two Sisters' liquor license expired by statute on April 30, 2008. Two Sisters then filed a hardship extension request on October 27, 2008, within 180 days of April 30, as allowed under § 10–504(d). On December 11, 2008, the Board held a hearing on this hardship extension request. The Board granted the request, thereby allotting 180 days from the date of the hearing for the license transfer application to be filed. Counsel for Two Sisters filed a second hardship extension request on June 8, 2009, which the Board again granted. The total time period for which the license could be deemed unexpired was thus 360 days from the cessation of alcoholic beverages business, or from April 30, 2008.[30] *See* § 10–504(d).

Two Sisters also filed an application for renewal of the liquor license in October 2008, although the exact date is unclear: the application was notarized on October 21, 2008, and the Board received it on or around October 31, 2008. Section 10–301(j)(2) permits the Board to charge a fee of up to $1,500 or even reject a late application but does not preclude the Board from accepting applications more than thirty days after the March 31 deadline. Accordingly, the Board was within its rights to accept Two Sisters' October 2008 renewal application.

Two Sisters' liquor license thus survived beyond Two Sisters' business itself and lived on to be renewed or transferred. We turn next to the various applications to take over the license and continue selling alcoholic beverages at 127 West 27th Street.

## II. Effect of Subsequent Applications

The Neighbors next argue that the subsequent applications from Mid Atlantic and Gluten Free were inadequate and

---

[B]oard will only be able to issue new restaurant and hotel licenses. Tavern or package store licenses cannot be replaced."

**30.** As we discuss below, this time period is held in abeyance upon the receipt of a transfer or renewal application, making the effective length of the hardship extension longer.

cannot make the liquor license qualify for an extension of the expiration period under § 10–504(d).

## A. Mid Atlantic's Application

The Neighbors assert that because Mid Atlantic's April 2009 application was substantively invalid, it could not stay the extended 360–day expiration period for licenses under § 10–504(d)(6). They claim that the application lacked information from one of the company's three owners, in violation of § 9–101(b); the remaining two applicants were not Baltimore City taxpayers, as required by § 9–101(c); and the three witness affidavits required were invalid because they came from individuals who were registered voters in Baltimore County, not Baltimore City, as mandated by § 10–104(d). The Neighbors also contend that because Mid Atlantic's application was "later abandoned as if never filed," it was effectively withdrawn, restarting the clock on the 360–day expiration period.

Mid Atlantic filed its application on April 21, 2009, just shy of 360 days from April 30, 2008. On September 30, 2009, the Board notified Mid Atlantic that its application would be voided if the Board did not hear from it within ten business days. As the Board noted in its letter, because the license was inactive, it would "expire by operation of law" unless the Board heard from Mid Atlantic. Within ten business days, on October 13, 2009, Gluten Free filed a substitute transfer application.

## B. Gluten Free's Application

The Neighbors argue that Gluten Free's application was likewise invalid because it did not meet the requirements of § 9–101(c): D'Souza was not a registered voter in Baltimore City nor a payer of property tax in his own name. Given their view that Mid Atlantic's April 2009 application was invalid, they also dispute the Board's finding that Gluten Free's application constituted a valid "amendment" of Mid Atlantic's application, arguing that it is impossible to "amend something that is void in the beginning."

## C. Analysis

As previously discussed, once the Board granted the hardship extension request, Two Sisters' license was considered unexpired for 360 days after Two Sisters stopped serving alcohol on April 30, 2008. *See* § 10–504(d)(4). That time period is tolled if a transfer application is pending. § 10–504(d)(5). If the Board grants the transfer application, the transfer must occur within 180 days of the Board's approval. § 10–503(d)(4). However, if the transfer application is withdrawn, "there shall be no tolling of the period for automatic expiration of the license and it shall be deemed as if no such application or request was filed." § 10–504(d)(6).

Section 10–503 sets out requirements for the transfer of licenses, but what is striking is what the statute does *not* specify. For example, there is no statutory requirement that the Board render a decision on a transfer application within a certain period of time. There is likewise no indication of whether an applicant may amend a defective application or whether there are any limits on the Board's power to accept such an amendment. The Board apparently operates under the assumption that it has the power to accept amended applications. At the June 24, 2010 hearing, the Board expressly rejected the Neighbors' arguments and denied their motion to dismiss the amended application. Although the Board initially expressed skepticism about D'Souza's argument that an incomplete application could be amended, it ultimately decided that the D'Souza application amended and rectified the "sloppy" Mid Atlantic application. The Board expressly found that "the petition was not withdrawn by the October 13th, 2009 amendments thereto."

While the Neighbors note that the "Board has cited no provision of Article 2B authorizing" the amendment of an application, they have not cited any provision that precludes the Board from considering an amendment. Absent evidence that the Board's decision to consider the amended application was "beyond the [Board's] powers" or was "illegal," § 16–101(e)(1)(i), we are not convinced that the Board's decision should be overturned. Review of the Board's interpretation of

ambiguous statutes remains somewhat deferential and typically gives "considerable weight" to the agency's interpretation. *See Opert*, 403 Md. at 593–94, 943 A.2d 1229. The Neighbors simply have not justified a reversal of the Board's decisions to accept (1) an application that was arguably deficient and (2) an amendment of that application.[31]

## III. Renewal Applications

The Neighbors contend that the renewal applications filed on behalf of Two Sisters in 2009 and Gluten Free in 2010 are invalid because "[n]either 'renewal' applicant was a 'licensee' or 'holder of an expiring license' as required at the time of filing." They assert that the 2010 application was invalid because D'Souza misrepresented himself as the licensee on the application when the Board had not yet approved the license transfer. The Neighbors argue that because the 2010 application was noncompliant, it should be treated as an original application under § 10–301(b), not a renewal application.

Because we have already determined that the Board has the authority to accept a late renewal application, we reject the Neighbors' claim that Two Sisters' 2009 renewal application was invalid simply because it was filed after their 2008 license expired. *See* Section I.C, *supra.*

▮▮▮ We likewise reject their asserted reasons that D'Souza's 2010 renewal application was invalid. The Board considered and rejected the Neighbors' arguments on whether D'Souza improperly filed a renewal application. We find no reason to substitute our judgment for its decision on the matter.[32] *See* § 16–101(e)(1)(i). D'Souza's Alcoholic Beverage License Application, filed in October 2009 for the 2009–2010

---

**31.** However, as we discuss *infra,* the question of D'Souza's voter registration and taxpayer status requires further consideration by the Board.

**32.** The record before this Court does not indicate whether the circuit judge ruled on this precise issue, as there was an interruption in the court's recording system during the judge's oral ruling.

license year, has "Transfer of Ownership" written in the "Office use only" section at the bottom of the application form. It would thus appear that the Board knew that D'Souza was filing a transfer application, not an original application, making the Neighbors' claims of misrepresentation without merit.[33]

## IV. The Board's June and August 2010 Decisions

The Neighbors also take issue with the Board's decisions in June and August 2010. They argue that (1) the Board did not have the authority to reconsider its June 2010 decision denying the license transfer, and (2) the Board's reversal of that decision in August 2010 was not supported by substantial evidence. For reasons stated below, we find that although the Board had the authority to reconsider its June decision, at least as to D'Souza's qualifications, the Board may have been mistaken.

### A. Reconsideration of June Decision

The Neighbors argue that the Board did not have the authority to reconsider its June 2010 decision at a later hearing. They point to § 10–208(c), which provides that in Baltimore City, "[i]f a license is refused, . . . other applications may not be considered from the applicant or for the premises, as the case may be, for a period of six months." [34] At the August hearing, the Board denied the Neighbors' motion to

---

**33.** The Neighbors' interpretation of D'Souza's application does not allow for the possibility that the Board simply directs transfer applicants to fill out the general application form. In other words, the Board may not have a separate transfer application form, and so D'Souza's application, albeit not proper if he were applying strictly as a renewal applicant, may be proper as a transfer applicant. However, the record and the briefs are silent on this point.

**34.** Section 10–208(c) provides in its entirety:
 (1) This subsection applies only in Baltimore City.
 (2) A class of license for which application was previously made for the retail sale of alcoholic beverages may not be issued to any person who has been refused the issue of any such class of license, nor to or for any premises for which a license has been so refused, within a

dismiss under § 10–208(c), noting that it had the "power to exercise revisions to its interim orders" and that the June 2010 decision denying the transfer "was not a final one."

██ The Board's interpretation of § 10–208(c) and the Neighbors' challenge involve a question of statutory construction. Because the text of § 10–208(c) does not plainly indicate what types of applications are covered and whether it applies to actions deemed by the Board to be interlocutory, it is ambiguous. Thus, we give deference to the Board's conclusion. *See HNS Dev.*, 425 Md. at 449, 42 A.3d 12; *Opert*, 403 Md. at 593–94, 943 A.2d 1229. Moreover, even if rejection of a license transfer is covered by the statute, it is unclear whether the Board's action was aimed at D'Souza or the premises. Therefore, under § 10–208(c)(3), the Board could have concluded in its sole judgment that the refusal was aimed at D'Souza and not against the premises and was not subject to § 10–208(c)(2). *See Philip Morris, supra,* 349 Md. at 678, 709 A.2d 1230. We therefore find that the Board had the power to reconsider its June 2010 decision.

## B. Reversal of June Decision

██ The Neighbors also argue that the Board's August 2010 reversal of its June 2010 decision was "without substantial evidence, arbitrary and capricious, and a violation of due process" because the Board based its new decision on the number of signatures on a petition rather than "the personal testimony of immediately affected residents." Although we reject the Neighbors' argument that the Board erred when it reconsidered evidence of support from the restaurant's neighbors,[35] we find that the Board's decision in August 2010

---

period of six months from the refusal by the Board of License Commissioners or by the Circuit Court, as the case may be.

(3) The restriction against the issue of a license to or for any premises is not effective if in the judgment of the Board of License Commissioners the refusal was directed against the person or persons applying for the prior license, and not against the premises in question.

**35.** The Board reconsidered some of the evidence presented at the June 2010 hearing, particularly the extent of the community support in the

granting the license was not supported by substantial evidence of D'Souza's compliance with the voter registration and taxpayer requirements.[36] *See Paek v. Prince George's County Bd. of License Comm'rs,* 381 Md. 583, 590, 851 A.2d 540 (2004) (reversing Board's decision if "not supported by substantial evidence").

■■■ Section 9–101(c) requires that for a limited liability company to receive a liquor license, that license must be

applied for by and be issued to 3 of the authorized persons of that limited liability company, as individuals, for the use of the limited liability company, at least 1 of whom shall be a registered voter and taxpayer of the county or city . . . and shall also have resided there at least 2 years before the application.

If the limited liability company has less than three members, then "all authorized persons shall make the application as provided in this section." § 9–101(c)(5)(ii).

---

area around the restaurant and "the really extreme unique nature of services and products to be offered by this business." It also considered an agreement that D'Souza entered into with two community and business associations since the June 2010 hearing. However, the Board emphasized the "unique nature" of the restaurant more than any other factor and unfavorably compared its previous denial of the liquor license with its "routine[ ] grant [of] licenses where potential uniqueness may be dubious." The Board concluded its decision by finding that "there is a public need and desire, a *de minimis* impact on existing licensees, a negligible impact on general health, safety and welfare, including crime, traffic and parking, and certainly a potential uniqueness (continued . . .) of services and products." It then granted the license transfer, "subject to the strict enforcement of the terms and conditions of the agreement between" D'Souza, the owner of 127 West 27th Street, and the community and business associations. Based on the evidence of community support before the Board at the time of the August hearing, we cannot conclude that the Board erred. *See Woodfield v. W. River Improvement Ass'n,* 395 Md. 377, 392, 910 A.2d 452 (2006) ("The Court must deal with the record as it is, not as it could have been[.]").

**36.** As discussed, *infra,* the voter qualification issue is impacted by a change in the law, which should be addressed by the Board in that first instance.

D'Souza testified at the June 2010 hearing. When asked if he had registered to vote, he stated "I haven't." He followed up on that answer with an explanation that he believed that when he became a United States citizen, he was automatically registered to vote, though he admitted that he was not sure if that was correct.[37] He also testified that he had been a Baltimore City resident for at least two years, though his wife was the sole owner of the house in which they lived. When asked to confirm that he asserted on his license application that he was a "resident or taxpayer of Baltimore City for more than two years," D'Souza stated that this information was still true. On cross-examination, however, D'Souza admitted that he did not know if he was registered to vote as of the date of the application and that he had never voted. When asked if he paid property tax in his own name, he stated that he did not. He testified, however, that he paid "Maryland personal property taxes, federal taxes, FICA, all that" on his bakery and his warehouse facilities, both of which were located in Baltimore City.

The evidence before the Board at the June 2010 hearing is contradictory at best and certainly does not lead to a finding that D'Souza is both a registered voter and a taxpayer. The Board's decision to grant the license transfer request was therefore not supported by substantial evidence regarding D'Souza's compliance with the requirements of § 9–101(c).

## V. Section 9–101(c) Requirements

Our conclusion that the Board failed to determine whether D'Souza is a taxpayer and a registered voter is complicated by a lack of clarity in the definition of "taxpayer" and by the passage of a new law. Although the Board, as the administrative agency, must consider and rule on these issues in the first

---

**37.** New citizens are not automatically registered to vote. *See Important Information for New Citizens,* U.S. Citizenship and Immigration Services, *available at* http://www.uscis.gov/USCIS/Office%20of%20Citizenship/ Citizenship%20Resource%20Center%20Site/Publications/PDFs/M-767.pdf

instance, we discuss them here to give the Board some guidance on remand.

## A. Taxpayer

At oral argument, counsel for the Neighbors argued that this Court had all the evidence it needed to find that D'Souza was not a taxpayer under § 9–101(c). They argue that under this provision only a real property taxpayer may qualify. But it is not clear that this position is correct.

Although "taxpayer," read literally, could mean any person who pays any tax, even sales tax or income tax, the word "taxpayer" must be read in the context of Article 2B, particularly when coupled with the words "of the county or city." *Cf. Superior Outdoor Signs, Inc. v. Eller Media Co.*, 150 Md.App. 479, 502–07, 822 A.2d 478 (2003) (defining "taxpayer" in the context of standing to challenge a municipal zoning regulation). Article 2B does not have a general definition of "taxpayer,"[38] nor has this Court or the Court of Appeals considered the meaning of the word in the alcoholic beverage laws.

Three Attorney General Opinions touch on the subject, however. In 1940, the Attorney General responded to a question from a member of a corporation that had applied for a liquor license. 25 *Opinions of the Attorney General* 88 (1940). Only one of the officers was a resident and registered voter in the county in which the application had been made, and the only tax that person paid was a personal property tax of $100 for his car. *Id.* In the Attorney General's view, Article

---

**38.** However, "taxpayer" is defined for a few counties in § 1–102(b):

(2) In Anne Arundel County, "taxpayer" means an individual who owns real property in the individual's own name, individually or jointly with others, and pays real property taxes to Anne Arundel county.

(3) In Prince George's and St. Mary's counties "taxpayer" means a resident who pays either real estate tax, income tax, or both....

(5) In Worcester County, "taxpayer" means an individual who owns real estate in Worcester County in his own name, either individually or jointly with others, and actually pays real estate tax in Worcester County.

There is no similar provision for Baltimore City.

2B did not "require that the applicant own property of a specific kind, or of a minimum value," making the car-owning officer qualified to apply for the license. *Id.*

Although the property tax on automobiles was abolished in 1947, *see* ch. 99, 1947 Md. Laws 142, in another opinion the Attorney General observed that this change did not affect "the right of an owner of an automobile to qualify as a taxpayer in the County and taxing area of his residence." 32 *Opinions of the Attorney General* 64 (1947). This opinion was based on the fact that an automobile owner must still pay a license fee to the State, which then remits part of the fee to the county in which the individual resides. *Id.* Yet a later opinion from the Attorney General appeared to repudiate the view that the payment of tax to the State suffices for tax to the county. In finding that the payment of income tax does not qualify an individual as a taxpayer under Article 2B, the Attorney General observed that the:

> [P]ayment of income tax to the State does not gratify the requirement that the officer be a taxpayer of the County or City and, we believe that this deficiency is not remedied by the fact that the State distributes to the various political subdivisions certain portions of the revenue derived from several taxes, including the income tax law.

35 *Opinions of the Attorney General* 87 (1950). The Board may wish to consider these opinions, along with additional testimony by D'Souza.[39]

### B. Voter Registration

Although the requirement that a license applicant be a voter has been the law in Maryland since 1933, *see* Act of December

---

**39.** The record also does not indicate what type of lease D'Souza signed. It may be possible that D'Souza actually pays the property taxes for 127 West 27th Street, as commercial leases are sometimes "net leases," or leases in which "the lessee pays rent plus property expenses (such as taxes and insurance)." *Black's Law Dictionary* 908 (8th ed.2004); *see also Penn Gardens Section Two v. Melnick*, 256 Md. 72, 74–75, 259 A.2d 520 (1969) (describing "net lease" that called for a monthly payment that included "the payment of all property expenses by the lessees").

5, 1933, ch. 2, 1933 Md. Laws (Extraordinary Session) 5, it seems that for over thirty years, it has been viewed by some as unconstitutional as applied to non-citizens. In 1976, Judge Joseph Mathias of the Circuit Court for Montgomery County found that the registered voter requirement of § 40(b) (the predecessor to today's § 9–101(b)) was unconstitutional. *See Reforzo v. Bd. of License Comm'rs,* Equity No. 56008 (Cir. Ct. for Montgomery Cnty. July 7, 1976). That case involved three non-citizens whose application for a liquor license was rejected by the local liquor board because they were not citizens.

In a letter from the Attorney General's office to the Baltimore City Liquor Board, forwarding a copy of the decision to the City Liquor Board, an Assistant Attorney General noted that the result seemed "virtually inevitable in view of several recent Supreme Court decisions" that held unconstitutional various citizenship requirements.[40] However, the Assistant Attorney General also interpreted the decision as:

> [L]imited to the situation in which the applicant is not a registered voter for the sole reason that he was legally precluded from registering to vote because of his alienage. We would .not interpret this ruling as going so far as to terminate the distinction often drawn in the alcoholic beverage laws between voters and non-voters.

The letter concluded with a recommendation that the Board "take such steps as are necessary administratively in order to reflect the unconstitutionality and invalidity of statutory provisions which would deny consideration of an application for a license solely on the basis of the alienage of the applicant."[41]

---

**40.** Letter from Gerald Langbaum, Assistant Attorney General, State of Maryland, to Joseph Van Collom, Executive Secretary, Board of Liquor License Comm'rs for Baltimore City (July 19, 1976) (citing *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); and *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976)).

**41.** An earlier letter from the Attorney General's Office, on whether the requirement that a license applicant be a United States citizen was constitutional, opined that "there is a substantial question as to the

Following 2012 legislation, the registered voter requirement no longer appears to apply to a person in D'Souza's situation. House Bill 232 and Senate Bill 534 of the 2012 Session added an exception to § 9–101(c): "In Baltimore City, an authorized person of a limited liability company who holds an alcoholic beverages license for the use of the limited liability company that was granted on or before June 1, 2012, need not be a registered voter in Baltimore City." Chapters 532 and 533, *Laws of 2012*.[42] The Board approved the liquor license transfer on August 12, 2010, so that D'Souza appears to fall under the terms of the statute.

However, this law was passed well after the hearing before the circuit court in March 2011, and so there has been no occasion for any party to raise any legal questions about the application of the new law or constitutional objections to it. Accordingly, we are unwilling to undertake a full analysis of the new law, as "our powers are limited to appellate review and we cannot invade the province of the *nisi prius* courts by making an original factual finding." *Hartley v. State*, 238 Md. 165, 168, 208 A.2d 72 (1965); *see also Workers' Compensation Comm'n v. Driver*, 336 Md. 105, 124 n. 7, 647 A.2d 96 (1994) (declining to address new statute passed during course of litigation).[43]

---

constitutionality of the citizenship requirement." Letter from William J. Rubin, Assistant Attorney General, State of Maryland, to State Senator Steny Hoyer, (Nov. 12, 1973). However, Maryland law still generally requires that a liquor license applicant be a United States citizen, with a few exceptions for specified counties. *See* § 10–103(b)(3).

**42.** This legislation almost certainly resulted from the circuit court's decision that the Board's decision to grant the transfer was invalid because D'Souza was not a registered voter.

**43.** *But see Delmarva Power & Light Co. v. Public Serv. Comm'n*, 371 Md. 356, 809 A.2d 640 (2002) (overturning legislation enacted between initial argument and reargument, without remanding to circuit court). Unlike this case, we note that the Court of Appeals considered a purely legal question in *Delmarva Power & Light Co.*, putting it in a better position to determine whether new legislation was unconstitutional solely on the basis of the parties' briefs and arguments before the Court. Examining the new section of § 9–101(c) may require some factfinding,

Moreover, because we have already decided that a remand is necessary to determine D'Souza's compliance with the taxpayer provisions, it is prudent to have the Board consider the voter registration on remand as well. In *Grasslands Plantation v. Frizz–King Enters.*, 410 Md. 191, 978 A.2d 622 (2009), a county enacted two zoning ordinances pertinent to the subject of an appeal just two weeks prior to oral argument before this Court. *Id.* at 200, 978 A.2d 622. The Court of Appeals determined that the new legislation applied to the challenged zoning action but declined to decide what effect the legislation had. Instead, the Court remanded to the zoning board for a decision, observing that it was "dealing with an administrative decision made before enactment of the new legislation, but one which we void for reasons other than the new legislation, *i.e.,* error in applying the burden of proof." *Id.* at 228, 978 A.2d 622. Similarly, because we remand to the Board for consideration of D'Souza's taxpayer status, *supra,* we find that the Board is in the best position to consider both issues.

The Board should therefore determine in the first instance whether the new law applies to D'Souza.

## VI. Equal Protection

 D'Souza and YIM argue that the voter registration requirement violates the equal protection component of Article 24 [44] of the Declaration of Rights for two reasons. First, they assert that the voting requirements in § 9–101 treat types of applicants differently. Partners who apply for a liquor license on behalf of a partnership do not need to be registered voters,

---

a task we are neither suited for nor prepared to do on the inconclusive record before the Court.

44. Article 24 provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Maryland courts consistently interpret Article 24 similarly to the Fourteenth Amendment to the United States Constitution. *Tyler v. City of College Park*, 415 Md. 475, 499, 3 A.3d 421 (2010). Accordingly, "the concept of equal protection is embodied in the due process requirement of Article 24." *Id.*

*see* § 9–101(a), while members of a corporation or LLC are required to be registered voters, *see* §§ 9–101(b), (c). They contend that this distinction "impermissibly creates classifications of citizens" in violation of the Declaration of Rights and the United States Constitution. Second, they argue that any voter registration requirement is unconstitutional because it treats citizens differently from non-citizens. They maintain that this policy unconstitutionally "bar[s] non-citizens from holding liquor licenses" because "[t]here is no rational connection between the voter registration requirement and the needs of the State to regulate the sale of alcohol."

We decline to reach the constitutional arguments for two reasons. First, even constitutional issues "must be pursued and exhausted" before the relevant administrative agency "before resort[ing] to the courts." *Prince George's County v. Ray's Used Cars*, 398 Md. 632, 651, 922 A.2d 495 (2007); *see also Insurance Comm'r v. Equitable Life Assurance Soc'y of the United States*, 339 Md. 596, 617, 664 A.2d 862 (1995) ("[C]onstitutional issues, including the constitutionality of applying particular statutes, can and often must be raised and initially decided in the statutorily prescribed administrative proceedings."). D'Souza and YIM did not raise their constitutional arguments before the Board and cannot do so for the first time in court. Second, because D'Souza is a United States citizen, he lacks standing to challenge the voter registration requirement on behalf of non-citizens. *See Clark v. State*, 284 Md. 260, 265, 396 A.2d 243 (1979) ("In other words, a person challenging the validity of a statute on equal protection grounds cannot rely on theoretical inequalities, or such as do not affect him, but must show that he is himself affected unfavorably by the discrimination of which he complains.") (Citations and internal quotations omitted). Finally, because the new law appears to eliminate the voter registration requirement for applicants like D'Souza, his constitutional challenges may also be moot.[45]

---

**45.** Indeed, counsel for D'Souza conceded the constitutional claims at oral argument.

## VII. Costs

Finally, the Neighbors argue that they are "entitled to the costs of preparing the transcripts of the Board's proceedings on June 24, 2010 and August 12, 2010." *See* § 16–101(e)(4)(i) ("Costs shall be awarded as in other civil cases."). The circuit court denied the Neighbors' requests for costs without prejudice in its Order of June 6, 2011, on the grounds that "the court has been unable to locate a certification of costs pursuant to Rule 7–206(a)."

■■■ Rule 7–206 provides that when testimony before an agency "has been recorded but not transcribed before the filing of the petition for judicial review, the first petitioner . . . shall pay the expense of transcription, which shall be taxed as costs and may be apportioned as provided in Rule 2–603." The petitioner must file a certification of costs with the agency, which must include the certification in the record on appeal. Md. Rule 7–206(a). Provided that the costs are known and "[u]nless otherwise provided by rule, law, or order of court, the prevailing party is entitled to costs." Md. Rule 2–603(a). Although Rule 7–206 requires merely substantial compliance, *see Volk v. Pugatch*, 262 Md. 80, 277 A.2d 17 (1971), even substantial compliance cannot be achieved if no one knows what the costs are. The circuit court's dismissal without prejudice of the Neighbors' request, on the grounds that the court did not have a certification of the costs, is reasonable and not an abuse of discretion.

---

Court: Counsel, just one last question. Is your client a U.S. citizen or not?

Counsel: He is now—well, he is and was at the time of the hearing.

Court: So all this talk about an equal protection issue premised on alienage is really not present, is it? You devote a lot of time to that in your second question presented in your brief. Is that issue now before us in light of the change in the statute? The voting issue?

Counsel: No. I think the statute rectifies it.

Court: So there's no more constitutional claim[s] that you're raising on behalf of Mr. D'Souza?

Counsel: Yes, as long as this Court determines that that is applied retroactively, as I think is the clear intent from the statute.

 Further, the Neighbors are not entitled to the costs of the transcripts from either the June or August 2010 hearings because they are not the prevailing party under Rule 2–603.[46] They argued that the Board's decision to deny the license transfer in June 2010 should be upheld, and we reject that argument, finding that the Board had the authority to reconsider its decision. They also argued that the Board's decision to grant the transfer in August 2010 should be reversed, and we instead remand the case for further factfinding on D'Souza's voter and taxpayer status.

For all of these reasons we affirm the Board's finding that the liquor license was "live" and subject to transfer but remand the case to the Board for further factfinding on D'Souza's status as a taxpayer and the effect of the changes to § 9–101(c) on D'Souza's application. Before the Board, the Neighbors are free to raise any constitutional and legal objections to the new statute that they may have.

**JUDGMENT AFFIRMED ON ALL ISSUES EXCEPT APPELLANT D'SOUZA'S COMPLIANCE WITH ARTICLE 2B, § 9–101(C). CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITHOUT AFFIRMANCE OR REVERSAL FOR REMAND TO THE BOARD OF LIQUOR LICENSE COMMISSIONERS TO DETERMINE APPELLANT D'SOUZA'S COMPLIANCE UNDER ARTICLE 2B, § 9–101(C). COSTS TO BE DIVIDED. THREE–FOURTHS TO BE PAID BY APPELLANTS, ONE–FOURTH TO BE PAID BY APPELLEES.**

---

**46.** Our decision does not extend to any costs incurred on remand to the Board.