Gen. 29]                                                                29

# ADMINISTRATIVE LAW

## ALCOHOLIC BEVERAGES – BOARD OF LIQUOR LICENSE COMMISSIONERS – SCOPE OF ADMINISTRATIVE AUTHORITY

April 15, 2015

*Ms. Michelle Bailey-Hedgepeth*
*Executive Secretary*
*Board of Liquor License Commissioners for Baltimore City*

On the recommendation of the Office of Legislative Audits, Mr. Douglas Paige—the former acting Executive Secretary of the Board of Liquor License Commissioners for Baltimore City ("Board" or "BLLC")—asked for our opinion on three questions that bear on the Board's activities and authority. As summarized by us, those questions are:

> 1. Does Article 2B, § 10-503(d)(4), which gives a person who has been granted leave to transfer a liquor license 180 days to "complete" the transfer, authorize the Board to extend that period by an additional 180 days, and, if not, may the Board infer that authority from other provisions in Article 2B?
>
> 2. May Board staff, without the prior approval of the Board, impose penalties for first-offense violations through informal procedures?
>
> 3. Does the Open Meetings Act apply to the hearings conducted by the Board and require the Board to adopt written minutes of those hearings?

In our opinion, the answer to the first two questions is "no." The Board does not have the authority to extend the 180-day deadline for transferring a liquor license, and Board staff may not exercise the Board's power to impose sanctions. The answer to the third question varies with the nature of the case before the Board. Generally speaking, the Open Meetings Act applies to the Board's hearings and deliberations on whether to grant a license or permit, and the Board must adopt written minutes of those meetings. The Board's hearings and deliberations in other matters are not subject to the Act if the proceeding is one for which a person could seek

review of the Board's determination in circuit court, and if the discussion is limited to such matters.

# I

## Introduction

The Board, a State agency, is authorized by various provisions in Article 2B of the Maryland Code[1] to license and regulate the sale of alcoholic beverages in Baltimore City. *See generally* 91 *Opinions of the Attorney General* 174, 175 (2006) and 83 *Opinions of the Attorney General* 3, 4-5 (1998) (giving brief histories of Maryland's alcoholic beverages laws). In this sphere, the Board "has rule making, investigatory, and prosecutorial authority." *Board of Liquor License Comm'rs v. Hollywood Prods.*, 344 Md. 2, 9 (1996) (citing Art. 2B, §§ 16-301(a) (conferring power to adopt rules and regulations) and 10-403(a) (providing authority to revoke or suspend licenses after notice and hearing)). Still, the Board must exercise its authority within the confines of Article 2B. *See Sullivan v. Board of License Comm'rs*, 293 Md. 113, 121 (1982) ("Of course, rules and regulations adopted by an administrative agency must be reasonable and consistent with the letter and spirit of the statute under which the agency acts.").

Article 2B declares that "the policy of the State" is to "regulate and control" the distribution of alcoholic beverages in order to "obtain respect and obedience to law" and "foster and promote temperance." § 1-101(a)(1), (b)(1). Among other things, Article 2B limits the term of licenses to one year, *see* §§ 10-206, 10-301, regulates the conditions on which liquor boards may grant or transfer licenses, *see* Title 9, provides the public with the opportunity to participate in the local boards' decisions to issue, renew, transfer, or continue a license, *see* Title 10, and sets penalties for violations of the article, *see* § 16-507.

Like most other units of State government, the Board is subject to "fiscal/compliance" audits by the Office of Legislative Audits ("OLA") in the Department of Legislative Services. *See* Md. Code Ann., State Gov't ("SG") § 2-1220(a)(2) (2014 Repl. Vol.) (stating the OLA's duties). The Board is also subject to a "performance audit," which must be conducted at least once every three years "to evaluate the effectiveness and efficiency of the management practices of the Board and of the economy with which the Board uses resources." SG § 2-1220(f)(1); 2011 Md. Laws, ch.

---

[1] All citations are to the Annotated Code of Maryland, Article 2B (2011 Repl. Vol. & 2014 Supp.) unless otherwise noted.

263. The OLA's performance audits of the Board "focus on operations relating to liquor inspections, licensing, disciplinary procedures, and management oversight." SG § 2-1220(f)(2).

The OLA began its first performance audit of the Board in October 2011 and issued its Performance Audit Report ("OLA Report") in March 2013. OLA Report at 12. In the course of the audit, OLA compiled a database of "licensee information, inspection activity, and disciplinary actions" for alcoholic beverage licensees during the license years covered by the audit. OLA Report at 11-12. The Report included three findings—Nos. 6, 17, and 20—that were accompanied by a recommendation that the Board seek our opinion on the three questions summarized above.

## II

**May the Board Extend the Deadline Set by § 10-503(d)(4), Which Requires a Successful Applicant for a Liquor License Transfer to "Complete" the Transfer Within 180 Days? (OLA Finding No. 6)**

### A. *Background*

#### 1. The Moratorium on New Licenses

The Article 2B provisions on the transfer of liquor licenses are best understood in the context of the moratorium on the issuance of most new liquor licenses in Baltimore. Under a law enacted in 1968, the Board, with few exceptions, may not issue new licenses within the neighborhoods bounded by Guilford Avenue and Howard, Center, and 25th Streets. 1968 Md. Laws, ch. 765 (adding former § 53B of Art. 2B (1969 Cum. Supp.)). A law enacted in 2008 further restricted the Board's ability to issue new licenses in certain circumstances. 2008 Md. Laws, ch. 425 (amending §§ 9-204.1 and 9-204.3).[2] The Board has also imposed a moratorium by rule under its statutory authority to set "definite standards" that limit the number of licenses available for any

---

[2] For example, the Board may issue a new "BD-7 Beer, Wine and Liquor" license for liquor sales in "tennis and/or racquet clubs," but not elsewhere. *See* Rules and Regulations for the Board of Liquor License Commissioners for Baltimore City, Rule 2.08(a)(3)(i) (1998) ("Board Rules"). Additional limitations, effective July 1, 2014, restrict the transfer of existing licenses into certain areas. 2014 Md. Laws, ch. 347 (adding § 9-204.1(i)).

neighborhood. *See* Art. 2B § 9-201(a)(1). Under that moratorium, the Board will not issue most types of new licenses "so long as the number of all licensed premises is more than one (1) for each thousand . . . or major fraction thereof, of the residents of Baltimore City." Board Rule 2.08. Because, in 2013, there were almost *two* licenses per thousand people in Baltimore,[3] the Board will not issue new licenses for most types of liquor sales.

The moratorium was adopted in 1968 as a means of reducing the density of liquor outlets in Baltimore. *See*, *e.g.*, City of Baltimore Council Bill 08-0031R (Resolution) (2008) (giving the history of the moratorium and noting studies finding that, "in and near neighborhoods where there is a high density of places that sell alcohol, there is a higher rate of violence"); Thornton, Greiner, and Jennings, "Alcohol Outlet Control Policy and Public Health in Baltimore," at 6 (Jan. 2013).[4] However, the moratorium does not apply to the renewal or "transfer of ownership and/or location" of licenses that had been issued before the rule was adopted. *See* Board Rule 2.08. The effectiveness of the moratorium as an attrition measure thus depends on the extent to which a license that is associated with a closed business may be transferred.

Liquor licenses in Maryland are hybrid in character, in that they are property for some purposes and not for others. Section 10-501(a) provides generally that "licenses issued under the provisions of this article shall not be regarded as property or as conferring any property rights." The Court of Appeals has construed this provision narrowly to apply only to the characterization of licenses as against the State. *See Dodds v. Shamer*, 339 Md. 540, 545 (1995) (explaining that the purpose of the provision was "to establish that the State's plenary power to control the sale of liquor predominates over any 'right' in the liquor license that a licensee might seek to assert against the State or the State authorized liquor licensing authority"). Thus, as against the State, the holder of a liquor license

---

[3] Comptroller of Maryland, "Alcohol & Tobacco Tax Annual Report, Fiscal Year 2013," at 30, *available at* http:// finances.marylandtaxes.com/static_files/revenue/alcoholtobacco/annual/ AnnualReportFY2013.pdf (showing a ratio of 1 license per 514 people).

[4] The use of a moratorium as a means of reducing the concentration of liquor licenses in a particular area is not uncommon. *See*, *e.g.*, *Marusic Liquors v. Daley*, 55 F.3d 258, 261 (7th Cir. 1995) ("Moratorium ordinances eventually reduce the number of liquor outlets in a neighborhood; [the applicant] acknowledges that this is a permissible governmental objective, which in light of the twenty-first amendment no one could doubt.").

has neither an entitlement to, nor a property right in, a license; after all, there is no inherent right to sell alcoholic beverages in Maryland, and the General Assembly may alter the conditions on which the liquor boards may issue or renew these one-year licenses. *See id.* at 546 ("[S]elling liquor pursuant to a license in Maryland is a privilege, not a constitutional right, and . . . this privilege is terminable at will.").

As against non-State entities, however, what might seem to be an ephemeral grant of permission becomes a marketable commodity with real value. *See*, *e.g.*, *Rosedale Plaza Ltd. P'shp v. Lefta*, *Inc.*, 140 Md. App. 243, 251 (2001) (noting that "[o]ften a liquor license is a very valuable asset of a restaurant or bar business"); *see also* 76 *Opinions of the Attorney General* 31, 33 (1991) (observing that "a [liquor] license unquestionably has commercial value"). Moreover, in Baltimore, that commodity is made scarce by the moratorium on most new licenses and the finite quantity of existing licenses available for transfer. So, while the purpose of the moratorium is to reduce by attrition the number of liquor establishments in the City, and the purpose of Article 2B is to "promote temperance," the moratorium has created a financial incentive for most license-holders in Baltimore to keep their licenses alive and preserve the ability to transfer them. Consequently, certain licenses in Baltimore are brokered as assets of considerable value whether or not the premises for which they were issued are still in operation.[5]

### 2. Restrictions on the Continuing Validity of Liquor Licenses

The General Assembly has enacted three measures that are designed to restrict the ability of a licensee to hold a license merely as an investment, disassociated with any ongoing operation of a liquor outlet. First, licensees must apply every year to renew their licenses and, in Baltimore City, they must pay a renewal application fee. §§ 10-206(a), 10-301(a), (j)(2). The Board did not seek our opinion on the way in which it applies this provision.[6]

---

[5] *See* Lynn Anderson, "Subpoena demands liquor board data," Baltimore Sun (Aug. 23, 2005) (describing how "a newly reconstituted liquor board has focused its attention on liquor license brokers who hold on to inactive licenses for years in hopes of selling them for a profit").

[6] In Baltimore, the renewal deadline has been applied flexibly. *See Yim*, *LLC v. Tuzeer*, 211 Md. App. 1, 28 (2013) (noting the Board's

Second, § 10-504(d) provides that a license will expire when the licensed business has not operated for the sale of alcoholic beverages for a period of 180 days, unless the Board has granted a hardship extension (which may not cause the disuse to exceed 360 days) or the licensee has applied to the Board for leave to transfer the license to another person. This provision is commonly referred to in Baltimore as "the 180-day Rule." Finally, § 10-503 sets a different 180-day time limit on *completing* a license transfer that has been approved by the Board. § 10-503(d)(4). We will refer to this provision as the "transfer deadline."

The OLA questioned the BLLC's implementation of the 180-day Rule and the transfer deadline. With respect to the 180-day Rule, the OLA found that the BLLC "did not monitor closed establishments to determine whether the alcoholic beverages licenses had expired in accordance with State law" and recommended that "the Board discontinue granting hardship extensions beyond that permitted by law." OLA Report at 53-54 (Finding 19; Recommendation 19). The Board did not ask for our opinion on this issue. The Board did, however, ask for our opinion as to the OLA's finding with respect to the transfer deadline, namely, that "BLLC did not always ensure that license transfers were completed within 180 days of receiving Board approval." OLA Report at 25 (Finding 6).

### § 10-503 – The Transfer Deadline

Section 10-503 of Article 2B contains some transfer provisions that are facially applicable statewide and some that apply only in certain jurisdictions. Section 10-503(a), which applies statewide, provides that a license holder may "transfer the holder's place of business to some other location or sell or assign the license and transfer the holder's stock in trade to another person" provided that, among other things, the new location or assignee "is approved by the board as in the case of an original application for such a license under [Art. 2B,] § 10-202." § 10-503(a)(2)(iv). By operation of this provision, an applicant for a transfer must "meet the same requirements as an applicant for a

---

"longstanding practice of accepting late applications" for renewal); *see also* Art. 2B § 10-206(a) (providing that licenses expire on the April 30th after their issuance or renewal, "unless otherwise provided"). In the past, the Board has indicated that it applies the deadline in such a way as to preserve the value of licenses used as collateral by landlords, banks, and other interested parties "who may not know that a licensee has not renewed the license." *See* H.B. 1363, 2012 Leg., Reg. Sess., Fiscal and Policy Note at 2.

new license," including the requirement that the transfer is "necessary for the accommodation of the public." *Baltimore County Licensed Bev. Ass'n v. Kwon*, 135 Md. App. 178, 187-88 (2000).

Section 10-503(d) applies only in Baltimore City and imposes additional conditions on license transfers. Only one of these additional conditions—the so-called "transfer deadline"—concerns us here: "A transfer of any license shall be completed not more than 180 days after the Board approves the transfer." § 10-503(d)(4). The OLA found that four of the ten license transfers that it reviewed had not been completed within 180 days of Board approval, with completion times ranging from 246 to 706 days. OLA Report at 25. The OLA thus questioned whether the Board had been complying with this part of the statute.

In its response to the OLA, the Board stated that, "[i]n the case of new construction, it is frequently impossible to complete the process for a new license or transfer within 180 days."[7] OLA Report, Appx., Board Response to Finding 6. Accordingly, the Board's practice, as recounted by the OLA, is to give applicants "up to an additional 360 days to complete the transfer, after which the license would become inactive." OLA Report at 25. The OLA indicated, however, that "this policy was not formalized" and "was not always followed."[8] *Id.* To the extent that the policy was followed, it appears that the Board's practice is to extend the transfer deadline for 180 days in the same manner that it does for hardship extensions under § 10-504(d) (*i.e.*, the so-called 180-day rule). The Auditor's question therefore goes not only to whether § 10-503 authorizes extensions of the transfer deadline, but also to whether § 10-504(d) authorizes hardship extensions for transfers.

---

[7] Even where a license is being transferred to an existing business, there are many other steps that the transferee must take before the transfer is deemed complete. Among other regulatory requirements, the transferee must pay all retail sales, amusement, admission, and withholding taxes and obtain a bulk transfer permit. *See* § 10-503(a)(2).

[8] The Board also stated that it had "previously sought advice from our legal advisor in the Attorney General's Office." OLA Report, Appx., Board Response to Finding 6. The Board's response did not identify the advice to which it referred, however, and this Office has since advised that the transfer deadline is mandatory and lacks an exception for hardship. Letter from Kathryn Rowe, Assistant Attorney General, to Del. Brian K. McHale (June 18, 2013).

### B. Discussion

#### 1. Whether § 10-503 Authorizes the Board to Grant Extensions to the Transfer Deadline

When the language in a statute is "plain and free from ambiguity, and expresses a definite and simple meaning," it is normally not necessary to "look beyond" that language to determine legislative intent. *Employees' Ret. Sys. of Baltimore v. Dorsey*, 430 Md. 100, 113 (2013) (citations and internal quotation marks omitted). Nor should an interpretation "add [o]r delete words to a clear and unambiguous statute." *Pridgeon v. Bd. of License Comm'rs*, 406 Md. 229, 238 (2008) (citations and internal quotation marks omitted). Nonetheless, "the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Dorsey*, 430 Md. at 113 (citations and internal quotation marks omitted). Statutory language can be ambiguous intrinsically, in that the words, on their face, are unclear, or extrinsically, when the words seem clear, but the application of them to particular circumstances is unclear. *Mayor & Council of Rockville v. Rylyns Enters.*, 372 Md. 514, 551-52 (2002) (citations omitted).

Section 10-503(d)(4) provides that "[a] transfer of any license shall be completed not more than 180 days after the Board approves the transfer." The word "shall" is "ordinarily presumed to have a mandatory meaning." *In re Anthony R.*, 362 Md. 51, 60 (2000) (citations and internal quotation marks omitted). It may be read as directory only when that reading is consistent with "the intention of the Legislature as gathered from the nature of the subject matter and the purposes to be accomplished." *Director, Patuxent Inst. v. Cash*, 269 Md. 331, 344 (1973) (quoting *Hitchens v. City of Cumberland*, 215 Md. 315, 323 (1958)). Courts have generally discerned a merely directory intent in two sets of circumstances: Provisions that impose a time constraint on the issuance of an arbiter's decision, *see, e.g., In re Adoption of Jayden G.*, 433 Md. 50, 80 (2013), or that fail to specify any sanction for non-compliance, *see, e.g., Columbia Rd. Citizens' Ass'n v. Montgomery County*, 98 Md. App. 695, 701 (1994), are frequently interpreted as directory only.

In our opinion, "shall" should be read in the mandatory sense here. First, neither circumstance that usually indicates the directory sense is present. The transfer deadline governs the conduct of the regulated parties, not the Judiciary, and while § 10-503 does not provide an *express* sanction for failure to comply with the 180-day

deadline, the sanction is implied: The Board's approval of a license transfer is valid for only 180 days, after which time the transfer is deemed invalid.

Second, the legislative history of the transfer provision points to the mandatory sense. The transfer deadline was added in 2000 to fill a gap in the existing law, which contained no deadline for completing a transfer that the Board had approved and thus allowed the licensee to keep the license alive indefinitely. *See* S.B. 128, 2000 Leg., Reg. Sess., Revised Fiscal Note at 1 (describing the then-current law). The bill's sponsor testified that the bill was introduced "to combat the practice of some license-holders of applying and getting approval for license transfers but not actually transferring the license." *See Yim*, 211 Md. App. at 32 (describing the sponsor's testimony before the Senate Economic and Environmental Affairs Committee). Indeed, the express purpose of the provision is restrictive; it was designed to "requir[e] in Baltimore City that a transfer of any alcoholic beverages license be completed in *not more than a certain amount of time* after [the Board] approves the transfer; . . . ." 2000 Md. Laws, ch. 56 (purpose paragraph) (emphasis added). The bill did not address exceptions to the transfer deadline, and § 10-503 still does not contain any.

Subsequent legislative activity indicates that the General Assembly has acted to expedite the transfer process, not to sanction the prolonging of it. For example, legislation enacted in 2014 closed what the Court of Special Appeals, in the year before, had characterized as a "striking" gap in the transfer provisions: The statute did not require the Board to "render a decision on a transfer application within a certain period of time" or place "any limits on the Board's power to accept" amendments to such an application. *Yim*, 211 Md. App. at 38 (upholding the transfer of a license that had gone unused for almost two years while the transferor was revising and completing its transfer application). As a result, applicants were allowed to prolong indefinitely the time period between the 180-day rule and the transfer deadline. *Id.* The General Assembly responded in the next legislative session and placed time limits on both the Board's evaluation of transfer applications and applicants' ability to submit amendments. *See* 2014 Md. Laws, chs. 346 and 347 (amending § 10-202 by adding (a)(4)).

By contrast, in 2009, the General Assembly *declined* to enact legislation that would have extended, from 180 to 360 days, the

time period in which Baltimore City licensee could reopen a closed business, resume alcoholic beverages operations, or else file for a hardship extension before the license expires. S.B. 233, 2009 Leg., Reg. Sess. The bill also would have increased the maximum duration of a hardship extension from 360 to 720 days. *Id.* Although we hesitate to read too much into the failure of individual bills, the legislative record suggests that the General Assembly intended that the Board expedite the transfer process, not grant open-ended extensions.

Our opinion that the transfer deadline should be applied according to its plain meaning and its legislative history also comports with the overall statutory scheme. As discussed above, that scheme employs liquor licenses as one mechanism by which the State "regulates and controls" the distribution of alcohol in order to "obtain respect and obedience to law and to foster and promote temperance." *See* § 1-101 (stating the policy of the State with regard to the distribution of alcoholic beverages). The purpose of the statutory scheme was not to create a market for licenses that can be held as "property" disassociated with any ongoing liquor establishment. *See* § 10-501 (liquor licenses are not "property"); *see also Dodds*, 339 Md. at 546 (explaining that liquor licenses are held as a privilege, not as a right, and are terminable at will). All in all, we think it clear that § 10-503 does not provide the Board with the authority to allow more than 180 days in which to complete a license transfer. We turn next to § 10-504 to see whether it provides such authority.

### 2.     Whether § 10-504 (the "180-Day Rule") Authorizes the Board to Grant Extensions to the Transfer Deadline

Like the transfer provisions of § 10-503, the provisions of § 10-504—which govern the continuation of licenses after a business has stopped operating—vary by jurisdiction. Generally speaking, licenses expire 10 days after a licensee has vacated or stopped operating the licensed premises. *See* § 10-504(a); *see also*, *e.g.*, *Rupinski v. Biel*, 43 Md. App. 635 (1979) (holding that a license had expired, and could not be transferred, because the business had closed more than 10 days before the application to transfer). As to Baltimore City, however, the General Assembly amended the statute in 1998 to provide that licenses do not expire until 180 days after a licensee has vacated or otherwise ceased to

operate the licensed premises.[9]  *See* 1998 Md. Laws, ch. 166 (formerly codified at Art. 2B § 10-504(d)(2)); *see also Yim*, 211 Md. App. at 32-33 (discussing history of 180-day rule).

The 1998 law included a "hardship" provision that, under certain circumstances, allowed a licensee to prolong the life of a license beyond the 180 days provided by statute.  Under that provision, a licensee could deposit the license with the Board and stop the 180-day clock for an additional 180 days if (1) "the licensee experiences a personal or financial hardship," (2) the licensee had not been evicted, and (3) the premises were not being used for "any other business purpose."  *See* 1998 Md. Laws, ch. 166.  Moreover, the licensee could then extend the additional 180-day period by applying to transfer the license under § 10-503.  Or, if the licensee had died, the administrator of the estate could apply to continue the business, *see id.*, as permitted under § 10-506.

Because the version of § 10-503 in place in 1998 did not state any deadline for completing an approved transfer, the upshot of these provisions was that a licensee in Baltimore City could use the transfer procedures to keep an inactive license alive indefinitely.  The licensee simply deposited the license with the Board on the grounds of a "personal or financial hardship," filed a § 10-503 application to transfer the license, and, in the event of the Board's approval of the transfer, delayed completion of the transfer.  Moreover, nothing prevented the licensee from withdrawing a transfer application and filing another one.  Combined with the lack of a deadline for completing transfers, the ability of licensees to simply declare the existence of a "hardship" enabled them to keep licenses alive for well beyond 360 days after the discontinuance of the business.

The same 2000 legislation that amended § 10-503 to impose a deadline for the completion of transfers also amended § 10-504 to change the hardship extension process.  *See* 2000 Md. Laws, ch. 56; § 10-504(d)(2), (4); *see also supra* at 37.  The 2000 legislation repealed the deposit provision that had allowed licensees to invoke the applicability of the hardship extension on their own; instead, licensees must now apply for a hardship extension, and the Board

---

[9]  Baltimore County was exempted from the statewide provisions of § 10-504(a) in 1979.  *See* 1979 Md. Laws, ch. 304; *see also Yim*, 211 Md. App. at 31.  The provisions governing the continuation of licenses in Baltimore County are provided at § 10-504(e) and are similar to those that apply in the City.

may only grant the application "on a finding that undue hardship currently exists causing the closing or cessation of business operations." § 10-504(d)(4). While a licensee can still stop the clock by filing a § 10-503 transfer request, the clock now begins to run again on the date on which the transfer or continuation is approved or denied. § 10-504(d)(5)(ii). In addition, transfer applications that are later withdrawn no longer serve to stop the clock, *see* § 10-504(d)(6); upon the withdrawal of the application, the "expiration period begin[s] running again, cumulatively to the period before the application or request . . . ." § 10-504(d)(5). Finally, in 2014, the General Assembly imposed additional deadlines on the Board's processing of transfer applications. *See supra* at 37-38.

The principles of statutory interpretation that we applied in the preceding section also apply here. The plain language of § 10-504(d)(4) authorizes the Board to grant hardship extensions to the 180-day rule only when the applicant has proven to the Board that "an undue hardship currently exists causing the closing or cessation" of the business for which the license is held. The provision thus looks to the circumstances that caused the *existing* business to close or cease operations. It does not apply to the circumstances of an approved license transferee who is encountering delays in opening a *new* business. In other words, the hardship exception does not authorize the Board to grant an extension on the basis of the hardship of the would-be licensee.

The General Assembly's intent to circumscribe the Board's discretion with respect to the life of liquor licenses is apparent from a comparison of the transfer deadline, which contains no provisions for extensions, and the 180-day business closure rule. The fact that the General Assembly explicitly provided for "hardship" extensions in § 10-504, but chose not to include such a provision in § 10-503, makes clear that reading into § 10-503 the authority to grant hardship extensions to the transfer deadline would alter or add to that statute. *See Insurance Comm'r of Md. v. Bankers Indep. Ins. Co.*, 326 Md. 617, 624 (1992); *see also Dep't of Motor Vehicles v. Greyhound Corp.*, 247 Md. 662, 668 (1967) (disapproving a proposed interpretation that would "add[] to [a statute], by judicial fiat, a provision which the Legislature did not see fit to include") (quotation marks and citation omitted).

As noted above, reading the hardship provision accordingly to its terms is consistent with the statutory goals of controlling liquor sales and promoting temperance. It is also consistent with the decisions of the Court of Appeals, which has been unwilling to infer an intention on the part of the General Assembly to authorize

the Board to exercise powers other than those expressly provided. *See Hollywood Prods.*, 344 Md. at 10-14 (holding that the Board did not have "implied authority to restrict the licensee's hours of Sunday operation"). Noting that alcoholic beverages are regulated in Maryland by the "comprehensive statutory scheme" set forth in Article 2B, the Court stated that "the authority of the administering agencies"—the liquor boards—"necessarily is more circumscribed than [that of] the typical administrative body." *Id*. at 13. The Court explained that, "[e]ven in cases where we have recognized broad delegations of authority, we have emphasized that agency rules and regulations must conform to the language and spirit of the statute under which the agency acts." *Id*. at 10-11. "'[T]he power . . . to make rules is not the power to make laws.'" *Id.* at 11 (quoting *Sullivan*, 293 Md. at 124); *see also Insurance Comm'r v. Bankers*, 326 Md. at 624 ("[A]n agency may not take action which is inconsistent or out of harmony with, or which alters, adds to, extends or enlarges, subverts, impairs, limits, or restricts the act being administered.") (internal citations and quotation marks omitted).

In sum, the "full power and authority" that § 16-301 grants to the Board to "adopt such reasonable rules and regulations as [it] may deem necessary to enable [it] effectively to discharge the duties imposed upon [it] by this article" does not include the power to change the deadline set by § 10-503. The 180-day rule and the transfer deadline reflect the General Assembly's policy choices as to the periods of time for which a license may remain inactive and the grounds that may be invoked for extending those periods, and the post-1998 amendments reflect a legislative intent to close gaps that had led to indefinite extensions. To the extent that the Board deems the transfer deadline problematic for those license purchasers who wish to engage in a lengthy construction of new premises before completing their purchase of the license, one solution is legislative. But the Board may not extend the transfer deadline beyond the period set by the General Assembly, and an approved transferee who does not yet hold the license may not claim the § 10-504 hardship exception.

## III

## Whether Board Staff, Without the Prior Approval of the Board, May Address Violations and Infractions Through Procedures Other than the Formal Hearing Process (OLA Finding No. 17)

### A.   Background – The Legislative Auditor's Finding No. 17

The Legislative Auditor found that Board staff, on its own initiative, allowed violators to resolve their infractions informally by paying a fine without undergoing the public hearing process before the Board.  Referring to agency staff as "BLLC" and the Board as the "Board," Finding 17 of the OLA Report states: "BLLC used alternatives to the Board hearing process to address violations and infractions and the Board had not formally approved these alternatives."  OLA Report at 49.  In summarizing the basis for Finding 17, the Report explains,

> BLLC had adopted alternatives to the Board hearing process to address licensee violations and infractions.  These alternatives were essentially carrying out functions of the Board but were not officially approved by the Board. Furthermore, unlike Board hearings, these alternative processes were not open to the public. The legality of their use is questionable since they were not addressed in State law pertaining to BLLC.

*Id*. at 49.

The Report also describes the different methods used by the staff for assessing fines without Board involvement.  For example, Board staff allowed licensees to avoid a public hearing before the Board for certain "administrative" violations by paying the "administrative fee" that the Board would ordinarily charge to hold a hearing on such violations.  *Id.*  For first-time violations that did not qualify as "administrative," the staff allowed licensees "to avoid a hearing before the Board by acknowledging that they committed the violation (essentially pleading 'no contest') and paying a $500 fine (the statutory maximum penalty for a first time offense)."  *Id.*  For repeat non-administrative offenses that did not involve violations for disturbing the peace, Board staff still allowed licensees to "avoid having their names appear in the public hearing docket (published on BLLC's website)" by pleading "no contest."

While these cases "were forwarded to the Board for a determination of a fine," they were conducted "without a hearing, and without the decision being documented in a transcript." *Id.* And for what the staff considered "minor license infractions" or when staff had received "a number of community complaints," the report describes how the Board staff used a process—known as an "in-house or compliance conference"—to discuss certain infractions with licensees. *Id.* at 49-50. Although staff "generally charged the licensee a $100 conference fee," they did not assess any "additional penalty or fine" and, for most cases the Auditor reviewed, did not include documentation of the conferences within the files for the relevant licensees.[10] *Id.* at 50.

Although the OLA "could not readily determine the frequency of these alternative practices," it recommended that the Board request an opinion from us "to determine if [Board] management has the legal authority to use alternative processes to address licensee violations and infractions," and, if so, that the Board approve "policies and procedures to comply with the legal Opinion." *Id.* The Report further recommended that staff "provide periodic reports of fines and fees assessed to licensees to the Board for informational purposes" and "document all decisions reached, including fines and fees assessed, and retain this documentation in the respective licensee files." *Id.* (Recommendation 17).

## B. Discussion – Whether the Board May Delegate to Its Staff the Power to Impose Sanctions

As summarized by the Court of Appeals, "[t]he actions that a Board may properly take under Article 2B to punish licensee misconduct include: impose a monetary fine, suspend a license, and revoke a license." *Board of Liquor License Comm'rs v. Fells Point Cafe*, 344 Md. 120, 136-37 (1996); *see also Paek v. Prince George's County Bd. of License Comm'rs*, 381 Md. 583, 599

---

[10] The Report also stated that Board staff also held "in-house conferences" to address uncontested applications for license transfers:

> The Board also effectively delegated to BLLC the approval of license transfers that were limited to a change in ownership if the community was not contesting the transfer. BLLC met with the licensees in an in-house conference and was to document the meeting for the licensee file.

OLA Report at 50. The Board did not ask us to address this practice.

(2004). Finding 17 raises the question of whether the Board has the power, whether express or implied, to delegate to its staff the authority to impose a fine and a "conference fee."

### 1.   Express Power

To determine whether a governing body has the express power to delegate its statutory functions to particular employees, courts look at the statutes that assign the power. In *Public Serv. Comm'n v. Wilson*, 389 Md. 27 (2005), for example, the Court looked to the Public Service Commission's governing statutes to determine whether its chairman had the authority to terminate an employee. Holding that the chairman lacked that power, the Court noted that, although "[l]anguage appears throughout the statute authorizing the Commission to 'hire' or 'appoint' all types of employees of the PSC," "there is no mention in this statute, nor any other statute we could find, of language that outlines the Chairman's authority, independent of the Commission's, to 'hire' or 'appoint' employees . . . ." *Id.* at 52. In *Board of Education of Montgomery County v. Montgomery County*, again addressing whether a certain employee had the authority to fire another, the Court stated: "The Council . . . can not delegate to its employees the performance of a duty which the Legislature has specifically provided shall be performed by the Council itself." 237 Md. 191, 202 (1964).

The Court of Special Appeals has applied this same principle outside the personnel context to hold that other forms of agency decision-making must also be done by the people to whom, or bodies to which, the applicable law has delegated that function. In *Carriage Hill-Cabin John*, *Inc. v. Maryland Health Resources Planning Comm'n*, for example, the court noted that, by statute, "the Commission may delegate to a single Commissioner the responsibility for reviewing an application, conducting evidentiary hearings, and preparing a proposed decision." 125 Md. App. 183, 217 (1999). The court made clear, however, that "the Staff had no authority to issue a final opinion in the name of the Commission." *Id.* at 219.

As to the Board, we found no provision in Article 2B that either authorizes the Board's staff to sanction licensees or permits the Board to delegate that power to staff. Instead, the article's "enforcement and penalties" are conferred on the Board itself. Section 16-507(d), for instance, provides:

> For any violation that is cause for suspension
> under the alcoholic beverage laws affecting

Baltimore City, the Baltimore City Board of License Commissioners may:

(1) For a first offense, impose a fine of not more than $ 500 or suspend the license or both; or

(2) For any subsequent offense, impose a fine of not more than $ 3,000 or suspend the license or both.

*Id.* Section 16-410(e) pertains to the assessment of fees in connection with hearings, and it provides that "[t]he *Board* may charge fees for the production and service of summonses and hearing notices." § 16-410(e)(2) (emphasis added).

The enforcement provisions of the statute define the term "Board" to "mean[] the Comptroller, the boards of license commissioners, or the members of the boards, as appropriate." § 16-410(a)(2). The term plainly does not include staff. Moreover, when the General Assembly describes the actions taken by Board staff, it does so expressly. *See* § 16-410(e)(2)(iii) (authorizing the Board to charge $25 for each address served if service is by "an employee of the Board"). In short, the enforcement provisions delegate to the Board, and not staff, the authority to impose sanctions and fees.

The provisions of Article 2B that relate to the liquor board staff are slightly less clear but, when read in context, likewise do not authorize the boards to delegate their authority to impose sanctions. Several provisions authorize the local boards to employ personnel, including a secretary, executive secretary, and "inspectors, clerical and other assistance as is necessary." *See* §§ 15-109(d); 15-112(a)(2), (d)(10)(iv). Former § 15-112(d)(7), as it was at the time of the audit, provided that the "chairman of the Board . . . [i]s its administrative officer and is charged with the duty of enforcing the provisions of this article." The chairman was to "personally supervise the activities and investigations of the several inspectors and other employees of the Board; . . . examine the location and general character of the licensees . . . ; and . . . make recommendations to the Board concerning . . . methods of enforcement, and promulgation of regulations to carry out the purposes of this article." *Id.* Those provisions did not state that the Board may delegate its quasi-judicial powers to staff; rather, the chairman would take the lead in ensuring that the Board was fulfilling its statutory duties.

These staffing provisions were altered by the 2014 legislation discussed above, which deleted the reference to the chairman's powers and instead placed them with the Board or its "designee":

> The Board or the Board's designee governs, administers, and enforces the provisions of this article in Baltimore City, including performing such tasks as:
>
> (i)   Supervising the activities and investigations of the several inspectors and other employees of the Board;
>
> (ii)   Examining the location and general character of the licensees in the City;
>
> (iii)   Reviewing the zoning of licenses . . . ; and
>
> (iv)   Adopting regulations concerning zoning of licensees and methods of enforcement to carry out the purposes and enforcement of this article.

2014 Md. Laws, ch. 346 (codified at § 15-112(d)(8)). Although the amended provision might be read as broadly authorizing the Board to delegate to a staff "designee" the power to "enforce[]" the statute, we believe its text and legislative history suggest a more limited authority.

First, when read in its legislative context, we believe the term "designee" likely refers to a Board member, as opposed to a member of the Board's staff. Prior to the amendment, the tasks enumerated in the statute had been the Chairman's responsibility. Although the evident purpose of the amendment was to give the Board the flexibility to designate someone other than the Chairman to take on the enumerated tasks, nothing in the legislative history suggests that the amendment was intended to take the larger step of authorizing *staff* to exercise the Board's powers. In fact, the amendment was part of a larger enactment focused on tightening the Board's administration of the licensing laws in response to the OLA's recommendations, many of which were focused on actions staff had been taking on its own. *See* S.B. 846, 2014 Leg., Reg. Sess., Revised Fiscal and Policy Note at 2-4 (explaining that bill provisions adopt many of OLA's recommendations). That context suggests that the General Assembly, by deleting the specific reference to the Chairman, did not intend a broad delegation of authority to staff.

Second, interpreting the term "designee" to include the Board's staff would seem to be inconsistent with the Court of Appeals' instruction that Article 2B grants the Board only "specific delegated powers, rather than broad delegated authority." *Thanner Enters.*, 414 Md. at 279. In light of the strict construction given the Board's powers, we believe it especially unlikely that the General Assembly intended to authorize the Board to delegate to staff the quasi-legislative power to "[a]dopt[] regulations." *See* § 15-112(d)(8)(iv). Again, we believe the better reading of the 2014 amendment is to authorize the Board to designate other members of the Board to play the roles previously played by the Chairman.

Finally, even if we were to read the amendment as authorizing a broad delegation to staff, the specific actions that it enumerates do not include the power to impose fines and sanctions on behalf of the Board. Although the enumerated tasks are not exhaustive, they illustrate the types of actions the General Assembly intended to authorize the Board to delegate to its designee. *See* Md. Code Ann., Gen. Prov. ("GP") § 1-110 (2014) (stating that the term "[i]ncludes" or "including," where it appears in the Maryland Code, means "includes or including by way of illustration and not by way of limitation"). None of the enumerated tasks encompasses the imposition of fines and sanctions; to the extent they address enforcement, they are limited to developing "methods" of enforcement, not the actual imposition of fines and penalties. *See State v. Sinclair*, 274 Md. 646, 658 (1975) (rule of *ejusdem generis* provides that "the general words in the statute will usually be construed to include only those things of the same class or general nature as those specifically antecedently mentioned"). In sum, we see no indication that the Legislature intended to authorize the Board to delegate to staff the authority to impose fines and penalties.

### 2. Implied Power

The express assignment of a function to an agency secretary or governing board sometimes includes the implied authority to delegate that function to agency employees. Much depends on whether the function is discretionary or ministerial. When the duty includes purely ministerial tasks and the statute is silent on how they are to be performed, the express power to perform the duty carries with it the implied authority to delegate the ministerial tasks. Conversely, discretionary functions generally cannot be delegated. *See 120 West Fayette St.*, *LLLP v. Mayor & City Council of Baltimore City*, 413 Md. 309, 350 (2010) ("'The rule is

plain and well established that legislative or discretionary powers or trust devolved by law or charter on a council or governing body cannot be delegated to others, but ministerial or administrative functions may be delegated to subordinate officials.'") (quoting *Baltimore v. Wollman*, 123 Md. 310, 315 (1914)); *see also* 61 *Opinions of the Attorney General* 734, 735-36 (1976) (stating that powers and duties "specifically conferred upon [a board] by statute could not be delegated to [staff]").

The Board's imposition of fines and fees is generally a discretionary function that may not be delegated in the absence of specific authority. Section 16-507(d)(1) provides that the Board "may" take various measures in first-offense matters that are "cause for suspension."[11]  Under that statute, the Board "may" impose a fine, and, if it does, it may do so in any amount that does not exceed $500.  *Id.*  The Board may also revoke, or instead, suspend the license. *Id*.  The "Board" further "may" assess costs for hearings, notices, and summonses.  § 16-410(e). For all of these actions, the General Assembly used the word "may," a term that "connotes a permissive, discretionary function."  *See Spencer v. Maryland State Bd. of Pharm.*, 380 Md. 515, 532 (2004).  The General Assembly did not expressly authorize the Board's staff to perform these discretionary functions, did not expressly authorize either the Board or its chair to delegate them, and did not empower staff and licensees to agree on off-the-record settlements of first-offense violations.

Under the general rule stated in *120 West Fayette*, these types of discretionary functions must be exercised by the Board, as the body upon which the function "devolved by law."  413 Md. at 350. We therefore think it unlikely that a court would infer from the Article 2B penalty provisions that staff may decide to omit an alleged violation from the Board's docket, decide on the form and amount of the penalty, and assess "conference" costs—all without the input or ratification of the Board.

Again, the authority of local liquor boards "is more circumscribed than [that of] the typical administrative body." *Hollywood Prods.*, 344 Md. at 13.  Remarking on the General Assembly's "close statutory control" over the alcoholic beverages business, the Court "has consistently held . . . that the General Assembly intended to grant the boards specific delegated powers,

---

[11]  The Board lacks discretion as to the appropriate remedy for some first offenses.  *See* § 10-401(a)(3) (providing that a license "must be revoked" for certain violations).

rather than broad delegated authority." *Thanner Enters.*, *LLC v. Baltimore County*, 414 Md. 265, 279 (2010); *see also Baines v. Board of Liquor License Comm'rs*, 100 Md. App. 136, 141 (1994) (noting that alcoholic beverage licensing boards must "scrupulously follow the statutory scheme that empowers them"). In *Hollywood Productions*, the Court stated that Maryland's "elaborate statutory scheme" of alcoholic beverages regulation "suggests a specific, rather than broad, delegation of authority to the liquor boards and contradicts the notion that restrictions, penalties, and sanctions may be fashioned on an *ad hoc* basis." 344 Md. at 16. This precedent, too, works against the notion that sanctions and fees may be imposed by Board staff instead of the Board.

Furthermore, allowing staff to exercise the Board's enforcement authority without the Board's involvement would undermine the Board's ability to implement other aspects of the statutory scheme. The Board's major functions include issuing, renewing, and transferring licenses, decisions that variously require the Board to evaluate the fitness of the licensee, the operation of the premises, and the location of the premises. *See* §§ 10-202(a)(2) (licensing standards); 10-301 (b), (c), (j) (renewal standards); 10-503 (transfer standards). In our view, an agreement by staff and a licensee that certain violations can be resolved without bringing them to the attention of the Board would frustrate the Board's ability to fully address future matters to which the fitness of the licensee or location and operation of the premises would be relevant.

Similarly, Article 2B entitles members of the public to oppose the issuance of a license, § 10-202(a)(1)(iv), and members of the public in the precinct of the licensed premises may seek the revocation of the license. § 10-403(a). The omission of violations from the Board's docket means that a person looking at a licensee's records will not have complete information on the licensee and the establishment. In sum, we see no statutory provision that authorizes the Board's staff to withhold from the Board's records, and thus presumably from the public, the fact of a licensee's "first offense."

### 3.   Actual Delegation

Finally, even if Article 2B authorized the Board to delegate to staff the power to impose penalties, that power may not be exercised in the absence of an actual delegation. *See Maryland*

*State Dep't of Health & Mental Hygiene v. Phoebus*, 319 Md. 710 (1990) (noting that, although the statute authorized the agency secretary to delegate the personnel decision to a subordinate, the agency did not establish that the secretary had made the delegation); *Eaton v. Rosewood Ctr.*, 86 Md. App. 366, 373 (1991) (noting that the department secretary was statutorily authorized to delegate certain hearing and final decision-making to a subordinate and had done so). Here, we see nothing in the OLA Audit or the Board's response that would suggest that the Board has ceded to staff any authority to consider whether, and in what form, to impose sanctions on licensees. Nor do the Board's Rules evidence any intent by the Board to do so. So, even if the Board had the statutory authority to delegate that function to the staff—which we do not believe is the case—it does not appear that the Board has actually done so.

In sum, it is our opinion that the Board does not have statutory authority to delegate to its staff the discretionary functions of deciding whether, and in what amount, to fine a first-time offender and whether to assess an administrative fee. Further, we have found no authority for the proposition that staff may decide to omit violations from the public record until such time as the licensee commits another violation.

## IV

### Whether the Open Meetings Act Requires the Board to Adopt Written Minutes of Its Hearings on the Cases Before It (OLA Finding 20)

The Board's last question relates to whether the Board's hearings are subject to the Open Meetings Act, and, if so, whether the Board has been complying with the Act's requirement that a public body keep minutes of its meetings. *See* OLA Report at 54 (Finding 20) ("Certain Board hearing practices may not comply with the Open Meetings Act."). The OLA described the Board's practices as follows:

> Although all Board hearings were fully transcribed by an independent vendor, [staff] generally obtained only a certified copy of the decision phase of the transcript for inclusion in the licensee file. The Board did not prepare any other record of the meeting minutes; therefore, it did not review and approve transcripts from prior meetings. The Board generally obtained complete transcripts only

> for disciplinary decisions appealed to the Circuit Court.
>
> \*     \*     \*
>
> In addition, each Board Commissioner did not state his or her individual vote for the record during the hearing as also required by the [Open Meetings] Act; rather, after discussion by the Commissioners off the record, the Board Chairman stated the overall decision of the Commissioners for the record.

*Id.* The Legislative Auditor also stated that:

> Although State law governing [the Board] requires [the Board] to be subject to the Open Meetings Act, it is unclear as to whether all actions taken at Board hearings are subject to the Open Meetings Act. Public Board hearings include actions relating to the approval of new licenses, the approval of license transfers, and disciplinary proceedings for licensee violations. Certain of these administrative actions can be appealed to the Circuit Court and, therefore, are considered quasi-judicial in nature. Quasi-judicial functions, by law, are generally not subject to the Open Meetings Act.

*Id.* The Auditor recommended that the Board "obtain written advice from the Office of the Attorney General over what Board hearing actions are subject to the minutes provisions of the Open Meetings Act." *Id.* at 55.

## A. *Discussion*

Maryland's Open Meetings Act applies to entities that fall within that Act's definition of a "public body" when they are meeting to perform a function to which the Act applies. *See* GP § 3-103 (stating the scope of the Act). When a public body meets to consider a matter, the Act applies to all phases of the public body's deliberations, not just the phase at which the public body acts on the matter. *See*, *e.g.*, *City of New Carrollton v. Rodgers*, 287 Md. 56, 72 (1980) (explaining that the "consideration or transaction of public business" that a public body must conduct in

compliance with the Act embraces "every step of the process," not simply the point at which the public body reaches a decision).

When the Act applies to a public body's meeting, the public body must keep minutes. GP § 3-306(b). The Board, as a multi-member body created by State statute, unquestionably falls within the Act's definition of a public body. *See* GP § 3-101(h)(1) (including in the definition of "public body" entities that consist of "at least 2 individuals" and are created by "State statute"); Art. 2B, § 15-101(a), (d) (requiring the Governor to appoint a board of license commissioners for Baltimore City). Your question goes to whether the functions that the Board performs at its meetings are covered by the Act, and, if so, whether the use of partial transcripts to document those meetings complies with the Act's requirements on the keeping of minutes.

The question of whether a public body is meeting to perform a function within the Act depends on what the public body discusses at the meeting and thus is not susceptible to a categorical answer. We can, however, outline the governing principles. First, the Act applies whenever a quorum of the members of a public body convenes to consider or transact public business unless the Act expressly provides otherwise. GP §§ 3-301 (open meeting requirement); 3-101(g) (definition of the word "meet"). Second, the Act applies when a public body is meeting "to consider . . . granting a license or permit." GP § 3-103(b). Third, the verb "consider" includes every stage of the public body's deliberations on the matter. *See*, *e.g.*, *Baltimore Dev. Corp. v. Carmel Realty Assoc.*, 395 Md. 299, 331 (2006) (deliberative process of public body must be open to the public because "every step of the process comprises the consideration or transaction of public business"). Fourth, the Act does not apply when the public body is performing "quasi-judicial" functions that do not involve granting a license or permit. GP § 3-103(a)(1)(iii), (b). Under the Act, the term "quasi-judicial function" includes the "determination of . . . a proceeding before an administrative agency for which Title 7, Chapter 200 of the Maryland Rules would govern judicial review." GP § 3-101(i). Those Maryland Rules govern appeals to circuit court when allowed by statute. *See* Md. Rule 7-201(a).

As applied to the work of the Board, these provisions of the Act require the Board to meet openly whenever it considers granting a license, whether by transfer or otherwise.[12] The Act thus

---

[12] Although the Open Meetings Act defers to the provisions of other law when they are "more stringent," *see* GP § 3-105, the Act's notice

requires that the Board conduct all phases of these deliberations in public. As to disciplinary proceedings, where the statute provides for an appeal to the circuit court, the Board's deliberations would likely be excluded from the Act so long as the Board's discussions are confined to that matter. The determination of whether a particular discussion is expressly excluded from the Act thus depends on the nature of the matter before the Board and should be made on a case-by-case basis. For the meetings that are subject to the Act, the question then becomes whether the Board's transcripts suffice as "minutes" under the Act.

When the Act applies to a meeting, the Board must keep minutes, adopt them "as soon as practicable after [it] meets," and then make them available for public inspection. *See* GP § 3-306. Written minutes must reflect "each item that was considered," the action that the Board "took on each item," and "each vote that was recorded." GP § 3-306(c). The Board need not prepare written minutes if "live and archived video or audio streaming of the open session is available," GP § 3-306(b)(2), and a transcript of a meeting could satisfy the requirement that minutes be kept. *See* 6 *OMCB Opinions* 164, 168-69 (2009).[13] Any such transcript, however, must include the information required by the Act and in "sufficient detail so that a member of the public who reviews the minutes can gain an appreciation of the issue under discussion." 6 *OMCB Opinions* 110, 113 (2009). If the Board wishes to use its transcripts as minutes, it must review and approve them, because the Act requires the adoption of minutes.

# V

## Conclusion

We conclude that: (1) the Board lacks the authority to grant hardship extensions to the transfer deadline set by § 10-504(d)(4);

---

provisions appear to be more stringent than those in Article 2B. Whereas the notice provisions of Article 2B only require the Board to give public notice of its "hearings" on applications for licenses and some license transfers, § 10-202(a), (e)(2), the Open Meetings Act explicitly applies whenever a public body is "meeting" to consider granting a license. GP § 3-103(b)(1). The Act's requirements thus control here.

[13] The Court of Special Appeals, while noting that Compliance Board opinions "are advisory only," *see* GP § 3-209, has found those opinions "to be of some utility" when there is a "dearth of authority" on an open meetings issue. *Dyer v. Board of Educ. of Howard County*, 216 Md. App. 530, 537 n.4, *cert. denied* 439 Md. 329 (2014).

(2) the Board lacks the authority to delegate to its staff the discretionary function of imposing sanctions on licensees; and (3) the Board's deliberations and actions on granting, renewing, and transferring licenses are subject to the Open Meetings Act, but, to the extent that the Board's actions on other matters are subject to judicial review, the Board's deliberations on those matters are likely not subject to that Act. When the Open Meetings Act applies, the Board must keep minutes in one of the forms required by the Open Meetings Act and must include the information required by that law.

Brian E. Frosh
Attorney General of Maryland

Ann MacNeille
Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice